# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | Case No. |
| | : | 3:21-CR-220 (VAB) |
| v. | : | |
| | : | |
| MAHESH PATEL, ROBERT HARVEY, | : | |
| HARPREET WASAN, STEVEN | : | |
| HOUGHTALING, TOM EDWARDS, and | : | |
| GARY PRUS, | : | |
| | : | June 29, 2022 |
| *Defendants*. | : | |
| | : | |

# MEMORANDUM OF LAW IN SUPPORT OF
# <u>DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ........................................................................................ 1

THE ALLEGATIONS ...................................................................................................... 4

STATUTORY BACKGROUND ...................................................................................... 7

MOTION TO DISMISS STANDARD............................................................................ 10

ARGUMENT .................................................................................................................. 11

I.    Given the Absence of Longstanding Judicial Experience Holding No-Poach Agreements to be *Per Se* Violations of the Sherman Act, and That Numerous Courts Have Appropriately Reviewed Such Agreements Under the Rule of Reason, the Restraint Alleged in the Indictment Cannot be Deemed a *Per Se* Offense, Requiring Dismissal. ............................................................. 11

II.   The Indictment Must be Dismissed Because it Pleads an Agreement That Was Ancillary to a Legitimate Business Collaboration. ............................................... 16

III. The Vertical Relationship Between Company A and the Outsource Suppliers Further Precludes Characterizing the Alleged Restraint as a *Per Se* Violation.... 31

IV. The Absence of Notice Requires Dismissal Under the Due Process Clause. ....... 37

V.  Judicial Application of the *Per Se* Rule Violates the Fifth and Sixth Amendments' Prohibition of Conclusive Presumptions in Criminal Cases................................. 44

CONCLUSION............................................................................................................... 46

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*2238 Victory Corp. v. Fjallraven USA Retail, LLC*,
  2021 WL 76334 (S.D.N.Y. Jan. 8, 2021) ............................... 32

*Albrecht v. Herald Co.*,
  390 U.S. 145 (1968) ......................................................... 37

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ................................................ 9

*Apex Oil Co. v. DiMauro*,
  713 F. Supp. 587 (S.D.N.Y. 1989) ....................................... 11

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) ......................................................... 44

*Arizona v. Maricopa Cty. Med. Soc.*,
  457 U.S. 332 (1982) ............................................ 11, 12, 45, 46

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006) .............................................. 31

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   2020 WL 2553181 (S.D. Cal. May 20, 2020) ..................... 14, 42

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ..................................... 14, 21, 22

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
  35 Fed. App'x 29 (2d Cir. 2002) ......................................... 32

*Blakely v. Washington*,
  542 U.S. 296 (2004) ......................................................... 46

*Bogan v. Hodgkins*,
  166 F.3d 509 (2d Cir. 1999) ......................................... passim

*Bouie v. City of Columbia*,
  378 U.S. 347 (1964) ......................................................... 37

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ............................................................ 12

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ........................................................... 9

*Carella v. California*,
  491 U.S. 263 (1989) ......................................................... 45

*Cenedella v. Metro. Museum of Art*,
  348 F. Supp. 3d 346 (S.D.N.Y. 2018) ..................................... 9

ii

*Cesnik v. Chrysler Corp.*,
490 F. Supp. 859 (M.D. Tenn. 1980) ............................................................ 23

*Coleman v. Gen. Elec. Co.*,
643 F. Supp. 1229 (E.D. Tenn. 1986) ...................................................... 14, 15

*Conrad v. Jimmy John's Franchise, LLC*,
2021 WL 3268339 (S.D. Ill. July 30, 2021) ...................................................... 35

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
720 F.2d 1553 (11th Cir. 1983) ...................................................................... 27

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
433 U.S. 36 (1977) .................................................................................. *passim*

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) .................................................................................. 16, 18

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
663 F.2d 405 (2d Cir. 1981) ................................................................ 9, 10, 35

*Craftsmen Limousine Inc. v. Ford Motor Co.*,
363 F.3d 761 (8th Cir. 2004) .......................................................................... 18

*Deslandes v. McDonald's USA, LLC*
No. 17-cv-04857 (JLA) (N.D. Ill. June 28, 2022) ................................. 8, 14, 33

*Deslandes v. McDonald's USA, LLC*,
2018 WL 3105955 (N.D. Ill. June 25, 2018) .................................................. 20

*Deslandes v. McDonald's USA, LLC*,
2021 WL 3187668 (N.D. Ill. July 28, 2021) .............................................. 22, 27

*Double D Spotting Service, Inc. v. Supervalu, Inc.*,
136 F.3d 554 (8th Cir. 1998) .......................................................................... 15

*Dr. Miles Med. Co. v. John D. Park & Sons Co.*,
220 U.S. 373 (1911) ...................................................................................... 36

*Eichorn v. AT&T Corp.*,
248 F.3d 131 (3d Cir. 2001) ....................................................................... *passim*

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*,
129 F.3d 240 (2d Cir. 1997) .......................................................................... 31

*Fonseca v. Hewlett-Packard Co.*,
2020 WL 6083448 (S.D. Cal. Feb. 3, 2020) .................................................... 14

*Francis v. Franklin*,
471 U.S. 307 (1985) .................................................................................. 44, 45

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) .................................................. 32

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
17 F. Supp. 2d 275 (S.D.N.Y. 1998) .............................................................. 11

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .................................................................................. 38

*Haines v. VeriMed Healthcare Network, LLC*,
613 F. Supp. 2d 1133 (E.D. Mo. 2009) ...................................................... 21

*Hertz Corp. v. City of N.Y.*,
1 F.3d 121 (2d Cir. 1993) ............................................................................ 8

*HR Staffing Consultants LLC v. Butts*,
627 Fed. App'x 168 (3d Cir. 2015) ............................................................ 27

*Illinois Corp. Travel v. American Airlines, Inc.*,
889 F.2d 751 (7th Cir. 1989) ..................................................................... 10

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................... 14

*In re Mushroom Direct Purchaser Antitrust Litig.*,
2015 WL 6322383 (E.D. Pa. May 26, 2015) .............................................. 32

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
395 F. Supp. 3d 464 (W.D. Pa. 2019) ........................................................ 14

*In re: McCormick & Co., Inc.*,
217 F. Supp. 3d 124 (D.D.C. 2016) ........................................................... 33

*K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co*,
61 F.3d 123 (2d Cir. 1995) ........................................................................ 35

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
359 U.S. 207 (1959) ................................................................................... 33

*Krzalic v. Republic Title Co.*,
314 F.3d 875 (7th Cir. 2002) ..................................................................... 42

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) .......................................................................... *passim*

*Madison Square Garden, L.P. v. National Hockey League*,
2007 WL 3254421 (S.D.N.Y. Nov. 2, 2007) ............................................. 26

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ............................................................... 17, 18

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
922 F.3d 713 (6th Cir. 2019) .............................................................. 17, 19

*Molinari v. Consol. Energy Inc.*,
2012 WL 4928489 (W.D. Pa. Oct. 16, 2012) ............................................ 14

*Mooney v. AXA Advisors, L.L.C.*,
19 F. Supp. 3d 486 (S.D.N.Y. 2014) .......................................................... 14

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ........................................................................ 26

iv

*Nat'l Soc. of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978)................................................................ 16

*NCAA v. Alston*,
    141 S. Ct. 2141 (2021) ............................................................ 8

*Nichols v. Spencer Int'l Press, Inc.*,
    371 F.2d 332 (7th Cir. 1967) ................................................ 15

*Ogden v. Little Caesar Enter., Inc.*,
    393 F. Supp. 3d 622 (E.D. Mich. 2019)...................... 22, 32, 35

*Paladin Assoc., Inc. v. Montana Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) .............................................. 18

*Polk Bros. v. Forest City Enters, Inc.*,
    776 F.2d 185 (7th Cir. 1985) ....................................... *passim*

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ............................................ 20

*Ring v. Arizona*,
    536 U.S. 584 (2002) ......................................................... 44, 46

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986)......................................... 17, 25

*Ryko Mfg. Co. v. Eden Servs.*,
    823 F.2d 1215 (8th Cir. 1987) .............................................. 32

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) .......................................................... 38

*Skilling v. United States*,
    561 U.S. 358 (2010)............................................................... 39

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................... 7, 8, 12, 37

*Success Systems, Inc. v. Excentus Corp.*,
    439 F. Supp. 3d 31 (D. Conn. 2020)..................................... 35

*Sweeney v. Pence*,
    767 F.3d 654 (7th Cir. 2014) ................................................ 26

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)............................................................ 7, 17

*Ulrich v. Moody's Corp.*,
    2014 WL 12776746 (S.D.N.Y. Mar. 31, 2014) .............. 13, 20

*Union Circulation Co. v. FTC*,
    241 F.2d 652 (2d Cir. 1957) ...................................... 13, 20, 39

*United States v. Adobe Sys., Inc.*,
    2011 WL 10883994 (D.D.C. Mar. 18, 2011) ................. 20, 28

*United States v. Aiyer*,
33 F.4th 97 (2d Cir. 2022) ................................................................ *passim*

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ...................................................................... 11

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016) ............................................................. 10, 15

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) ............................................................. 11, 33

*United States v. Arnold, Schwinn & Co.*,
388 U.S. 365 (1967) ................................................................................. 37

*United States v. DaVita*,
2022 WL 266759 (D. Colo. Jan. 28, 2022) ................................. 9, 14, 17

*United States v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013) ................................................ 14

*United States v. Gaudin*,
515 U.S. 506 (1995) ................................................................................. 44

*United States v. General Motors Corp.*,
384 U.S. 127 (1966) ................................................................................. 33

*United States v. Harriss*,
347 U.S. 612 (1954) ................................................................................. 37

*United States v. Knorr-Bremse AG*,
2018 WL 4386565 (D.D.C. July 11, 2018). ......................................... 29

*United States v. Koppers Co., Inc.*,
652 F.2d 290 (2d Cir. 1981) ................................................................... 45

*United States v. Lanier*,
520 U.S. 259 (1997) ........................................................................... 37, 38

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ............................................................. 10, 11

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ............................................................... 12

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ................................................................................. 46

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972) ..................................................................... 9, 12, 43

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) ................................................................................. 38

*United States v. Was*,
684 F. Supp. 350 (D. Conn. 1988) ........................................................ 11

*Weisfeld v. Sun Chem. Corp.*,
   84 F. App'x 257 (3d Cir. 2004) ........................................................................ 15

*Yi v. SK Bakeries, LLC*,
   2018 WL 8918587 (W.D. Wash. Nov. 13, 2018) ................................................ 14

**Statutes**

15 U.S.C. § 1 ............................................................................................................. 7

15 U.S.C. § 45(a) ..................................................................................................... 13

**Other Authorities**

Br. of Amicus Curiae National Association of Criminal Defense Lawyers in Support of Pet'rs,
   *Sanchez v. United States*,
   140 S.Ct. 909 (2020) (No. 19-288), 2019 WL 5566391 ....................................... 46

Br. of Amicus United States in Support of Neither Party, *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14 ............................................ 36

Charles D. Weller,
   *Price Fixing and Insider Trading are Unconstitutional Crimes*, Law 360 (Feb. 6, 2015) ...... 45

Corrected Statement of Interest of the United States, *Harris v. CJ Star, LLC*,
   No. 18-cv-247 (E.D. Wash. Mar. 8, 2019), ECF No. 38 ....................................... 28

Corrected Statement of Interest of the United States, *Richmond v. Bergey Pullman Inc.*,
   No. 18-cv-246 (E.D. Wash. Mar. 8, 2019), ECF No. 45 ....................................... 28

Corrected Statement of Interest of the United States, *Stigar v. Dough Dough, Inc.*,
   No. 18-cv-244 (E.D. Wash. Mar. 8, 2019), ECF No. 34 ................................. 28, 40

Debbie Feinstein, et al., Fed. Trade Comm'n, Office of Policy Planning,
   *Competitive job markets offer more than just fringe benefits* (Oct. 20, 2016),
   https://www.ftc.gov/enforcement/competition-matters/2016/10/competitive-job-markets-offer-more-just-fringe-benefits ........................................................................ 28, 43

Earl R. Brubaker,
   *Free Ride, Free Revelation, or Golden Rule?* 18 J.L. & Econ. 147 (1975) ...................... 26

Edmund W. Kitch,
   *The Law and Economics of Rights in Valuable Information*, 9 The Journal of Legal Studies 4 (1980) ............................................................................................ 26

Evan Starr,
   *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 Indus. & Labor Rel. Rev. 783 (2019) .................................... 24

Gov't Opp'n to Mot. to Dismiss, *United States v. Hee*,
   No. 21-cr-98 (D. Nev. Oct. 1, 2021), ECF No. 47 ............................................... 30

Hoon S. Cha, David E. Pingry, and Matt E. Thatcher,
   *Managing the Knowledge Supply Chain: An Organizational Learning Model of Information Technology Offshore Outsourcing*, 32 MIS Q. 2, 248 (2008) ...................... 25

Indictment, *United States v. DaVita, Inc.*,
No. 21-cr-229 (D. Colo. July 14, 2021) ................................................................. 40

Indictment, *United States v. Hee et al.*,
No. 21-cr-98 (D. Nev. Mar. 30, 2021) .................................................................... 40

Indictment, *United States v. Manahe*,
No. 22-cr-13 (D. Me. Jan. 27, 2022) ...................................................................... 40

Indictment, *United States v. Surgical Care Affiliates, LLC*,
No. 21-CR-11 (N.D. Tex. Jan. 5, 2021) .................................................................. 40

James J. Brosnahan & William J. Dowling III,
*The Constitutionality of the Per Se Rule in Criminal Antitrust Prosecutions*, 16 SANTA CLARA
L. REV. 55 (1975) ................................................................................................ 45

Jessica Jeffers,
*The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship*
(working paper, Dec. 2019) ................................................................................... 24

Jonathan M. Barnett & Ted Sichelman,
*The Case for Noncompetes*, 87 U. CHI. L. REV. 953 (2020) .................................... 24

Jury Instr., *United States v. DaVita*,
No. 21-cr-229 (D. Colo. Apr. 13, 2022) ................................................................ 42

Paul H. Rubin & Peter Shedd,
*Human Capital and Covenants Not to Compete*, 10 J. LEGAL STUD. 93 (1981) ...................... 24

Pet. for Writ of Cert., *Sanchez v. United States*,
140 S.Ct. 909 (2020) (No. 19-288), 2019 WL 4235513 ........................................ 45

Phillip E. Areeda & Herbert Hovenkamp,
*Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed. 2010).. 11, 33

Reporter's Tr., Oral Argument, *United States v. DaVita*,
No. 21-cr-229 (D. Colo. Nov. 19, 2021) ................................................................ 29

Robert Bork,
*Ancillary Restraints and the Sherman Act*, 15 ABA ANTITRUST SEC. PROC. 211 (1959) ........ 23

Robert Connolly,
*How Per Se Rule Will Die In Criminal Antitrust Cases*, LAW 360 (Mar. 20, 2019) ............... 45

Ronen Avraham, K. A. D. Camara,
*The Tragedy of the Human Commons*, 29 CARDOZO L. REV. 479 (2007) .............................. 26

Russell B. Korobkin & Thomas S. Ulen,
*Law and Behavioral Science: Removing the Rationality Assumption from Law and Economics*,
88 CALIF. L. REV. 1051 (2000) ............................................................................. 26

Stewart E. Sterk,
*Restraints on Alienation of Human Capital*, 79 VA. L. REV. 383 (1993) ............................ 24

U.S. Dep't of Justice, Antitrust Div.,
*Antitrust Division Manual* (5th ed. updated July 2019) ........................................... 2

U.S. Dep't. of Justice, Antitrust Division & Federal Trade Commission, *Antitrust Guidance for Human Resource Prof'ls* (Oct. 2016) ............................... 28, 39, 42, 43

United States' Mem. in Support of Disputed Proposed Jury Instrs., *United States v. DaVita*, No. 21-cr-229 (D. Colo. Feb. 22, 2022), ECF No. 178 .......................................... 41

United States' Mot. for Leave to File Statement of Interest, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857 (E.D. Ill. Feb. 17, 2022), ECF No. 446 ...................................................... 40

United States' Omnibus Mot. in *Limine* at 3-4, *United States v. Jindal*, No. 20-cr-358 (E.D. Tex. Mar. 28, 2022), ECF No. 73 .......................................................... 40

United States' Omnibus Mot. in *Limine*, *United States v. DaVita*, No. 21-cr-229 (D. Colo. Dec. 17, 2021), ECF No. 107 .......................................................... 41

United States' Opp'n to Defs.' Mot. to Dismiss the Indictment, *United States v. Manahe*, No. 22-cr-13 (D. Me. June 21, 2022), ECF No. 89 ................................................................ 41

United States' Response to Defendant VDA OC, LLC's Notice of Additional Authority, *United States v. Hee*, No. 21-cr-98 (D. Nev. May 11, 2022), ECF No. 89 ................................................. 41

Verdict, *United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo. Apr. 15, 2022), ECF No. 264 ........................................................ 29

Verdict, *United States v. Jindal*, No. 20-cr-358 (E.D. Tex. Apr. 14, 2022), ECF No. 112 ........................................................ 29

### Rules

Fed. R. Crim. P. 12(b)(3)(B)(v) ..................................................................................... 11

Fed. R. Crim. P. 7(c)(1) ................................................................................................. 11

# PRELIMINARY STATEMENT

This case is unlike any criminal antitrust case the Department of Justice ("DOJ") has ever brought. It is unsupported by legal precedent and is contrary to DOJ's own public guidance on the type of employee "no-poach" agreements that DOJ will prosecute as violations of the criminal antitrust law. The Indictment charges a *per se* violation of Section 1 of the Sherman Act based on an alleged agreement among an aerospace engine design, manufacture and service company (referred to in the Indictment as "Company A") and several of its suppliers of outsourced engineering services not to solicit for hire or hire employees working on projects for that same company. But precedent dictates that a "no-poach" agreement that furthers a legitimate customer-supplier business collaboration, as alleged, cannot amount to a *per se* violation. Indeed, the DOJ and the Federal Trade Commission ("FTC") have previously recognized such agreements within customer-supplier collaborations, as here, as procompetitive and legal. Moreover, while criminal "no-poach" prosecutions are novel—the first four were filed in 2021, with one following in early 2022—all of those cases involved alleged horizontal "naked" agreements between competitors, with no related legitimate business collaborations. This case, however, is fundamentally different because the allegations hinge on an agreement in furtherance of a legitimate business collaboration, removing it even further from the reach of the *per se* rule than any prosecution to date. For these reasons and on the additional and independent bases set forth below, the Indictment must be dismissed.

The Indictment, in one Count, alleges a *per se* conspiracy to restrain trade against a former manager and director of Company A and individuals employed by four engineering outsourcing companies ("Suppliers") who have worked on contracts for Company A. It charges that Company A and the Suppliers agreed that they would not solicit for hire or hire one another's engineers and

other skilled labor employees assigned to Company A's "projects." The Indictment also alleges that certain Defendants further agreed during certain periods of time not to solicit to hire or hire certain employees of one of the Suppliers, called Company B in the Indictment.

The charge does not state a crime and must be dismissed.

*First*, the Indictment's allegations plainly establish that the charged conduct falls outside of those limited categories of conduct that the courts, through long judicial experience, have recognized as justifying *per se* treatment. Under well-established law, including in this Circuit, this alone requires dismissal.

*Second*, and independently, the Indictment must be dismissed because the alleged agreement was ancillary to a legitimate business collaboration, namely, contracts to provide outsourced engineering services to Company A. The courts have consistently held that such "ancillary" restraints should be analyzed under the rule of reason, not the *per se* rule, and should be pursued solely in civil litigation, not by criminal prosecution.[1] And this established case law cannot be disregarded here based on the Indictment's mere labelling of the charged no-poach agreement as an "allocation" of a labor market.

*Third*, the charge must be dismissed because the alleged *per se* restraint was in furtherance of the "vertical" commercial relationship between Company A, a customer, on the one hand, and

---

[1] The DOJ Antitrust Division, by long-standing policy, does not criminally prosecute agreements assessed under the rule of reason. *See* U.S. Dep't of Justice, Antitrust Div., *Antitrust Division Manual*, III-12 (5th ed. updated July 2019) ("In general, current Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements . . . . Civil process and, if necessary, civil prosecution is used with respect to other suspected antitrust violations, including those that require analysis under the rule of reason . . . ."); Reporter's Tr., Oral Argument at 36:25; 37:1, *United States v. DaVita*, No. 21-cr-00229 (D. Colo. Nov. 19, 2021) ("[A]s a matter of prosecutorial discretion, we do not bring rule of reason cases criminally.").

Companies B-F, each a supplier, on the other. This "intrabrand" arrangement promoted interbrand competition among Company A's competitors for the sale of engines and services, requiring judicial analysis under the rule of reason. The rule of reason also applies here because the Indictment itself clearly defines the alleged agreement as a hybrid vertical-horizontal agreement, among Company A and each of the Suppliers, Companies B-F. Recognizing that such complex, economic relationships are more likely to expand output and promote competition than not, the Supreme Court has made clear that agreements of this nature are subject to rule of reason analysis, not *per se* treatment. Additionally, the Indictment's allegation that there was an agreement, subject to exceptions, not to solicit or hire employees of (Supplier) Company B during specific periods of time or absent certain conditions, also states a vertical restraint, making it subject to rule of reason analysis as a matter of law.

*Fourth*, the Indictment, by targeting a non-solicitation and no-hire agreement as a *per se* Section 1 violation, runs headlong into the notice provisions of the Due Process Clause, where courts, including in this Circuit, have *only* analyzed no-hire and non-solicitation terms under the noncriminal rule of reason standard. This notice problem is especially severe here, where the Indictment itself describes an agreement in furtherance of a legitimate business collaboration that the DOJ's own published guidance has placed out of reach of the *per se* rule.

*Lastly*, if permitted to proceed, a *per se* charge, in the context alleged by the Indictment, would unconstitutionally usurp the jury's role to determine all of the facts necessary to establish each element of a charged criminal statute.[2]

---

[2] As demonstrated in an accompanying joint motion ("Grand Jury Minutes Motion") of all Defendants, in the circumstances of this case, there is ample reason for the Court to order disclosure to the defense of the government's instructions to the Grand Jury, or in the alternative, for the Court to review these instructions *in camera*. As detailed in the Grand Jury Minutes

## THE ALLEGATIONS

The Indictment on its face alleges an agreement not to hire or solicit employees that was inextricably part of a legitimate business collaboration. Company A, based in Connecticut, is a large aerospace engine design, manufacture, and service company. Indictment ("Ind.") ¶ 2.[3] It relied on sources of labor including outsourced engineering services "to design, manufacture, and service" its products. Ind. ¶ 2. In an outsource arrangement, "an outsource engineering supplier . . . enter[s] into a contract with a customer, such as Company A, to complete a particular project, assign[s] engineers and other skilled workers from among its own employees to complete that project, and then receive[s] an agreed-upon payment from the customer for such work." Ind. ¶ 3. In Company A's outsourcing arrangements, the Company entered into a master services contract with an outsource engineering service supplier to perform specific project-related services under statements of work and purchase orders. Ind. ¶¶ 10, 28(d). Suppliers, which are identified in the Indictment as Companies B through F, competed against one another for awards of "outsource work projects" from Company A, "including on the basis of (low) price," and "to recruit and hire engineers and other skilled workers." Ind. ¶ 4.

Defendant Patel worked for Company A; each of the other Defendants was employed by a Supplier, B-E. Ind. ¶¶ 10-15. Patel "was the Manager and (later) Director of the unit within

---

Motion, given (a) the established judicial precedent calling for rule of reason analysis in this case and (b) recent changes in DOJ's position concerning the appropriate standard under which to assess no-hire agreements in the setting of collaborative business activity, the need for such review is readily established. The relief sought by the Grand Jury Minutes Motion is supported further because the government, during the Grand Jury's proceedings, affirmatively cut off or redirected witness testimony that was probative of the benefits of the collaborative and vertical business agreements in this case. If, as expected, the Grand Jury minutes reflect that the government mis-instructed the jury on the law, the Indictment should be dismissed on this ground alone.

[3] Defendants contest the Indictment's allegations. Herein, however, as required for this Motion, the Indictment's allegations are posited as assumed facts.

Company A in charge of managing the relationships between Company A and its Suppliers." Ind. ¶ 10. He and his associates allegedly "controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Company A." Ind. ¶ 10. "Patel was also involved in master contract negotiations between Suppliers and Company A's parent company, which provided for maximum pricing charged by each Supplier to Company A for the completion of outsourced projects." Ind. ¶ 10. Supplier Defendants allegedly each had "substantial responsibilities regarding maintaining and advancing their respective companies' business relationships with Company A, as well as hiring and recruiting at their respective companies." Ind. ¶ 16.

The Indictment does not allege a general, market-wide agreement among companies in the aerospace industry to restrict the employment of aerospace engineers and other skilled workers. It does not even allege a general agreement among Company A and the Suppliers or among the Suppliers not to hire or recruit any employees from one another. Rather, it alleges an agreement solely related to *specific* employees working on *specific* projects for Company A pursuant to *specific* statements of work and purchase orders entered into pursuant to *specific* "master contract[s]," Ind. ¶ 10, between each Supplier and Company A. The Indictment charges that "[b]eginning at least as early 2011 and continuing until as late as September 2019," Defendants entered knowingly into a conspiracy "between and among each other, Companies A-F, and others known and unknown" "to suppress competition by allocating employees in the aerospace industry *working on projects* for Company A," by "agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies A-F in the United States." Ind. ¶ 19 (emphasis added). Limited to those working on these projects, the Indictment alleges that Defendants agreed to "not hir[e] such employees of Companies B-F" and "not proactively

contact[], interview[], and otherwise recruit[] potential applicants to Companies B-F who were employed by another" Supplier.  Ind. ¶ 21.

The criminal charges here are a radical departure from the few other government no-poach cases of 2021 and 2022 alleging criminal violations of the Sherman Act.  In such cases, to support application of the *per se* standard under Section 1, the government has underscored that defendants in those cases were associated with businesses that were not engaged in collaborative activity with one another.  Not so here.  The legitimate business collaboration among Company A and its Suppliers is plain on the face of the Indictment, which emphasizes that the alleged conduct falls within the complex of outsourced "projects for Company A."  Ind. ¶ 19.  Consistent with the legitimate business collaboration among these companies to deliver on Company A's projects, the Indictment cites various examples of Company A's alleged attempts (through Mr. Patel) to enforce the alleged no-hire and non-solicitation requirements among its Suppliers, and the Supplier's alleged requests to Mr. Patel to do so.  *See, e.g.*, Ind. ¶¶ 22(a), 25(b), 25(c), 27(b), 28(b), 28(c), 28(e), 28(f).  That Company A considered its Suppliers to be part of a business collaboration critical to its success is also plain from the allegations in the Indictment, which quotes Mr. Patel referring to the Suppliers as "partners" or "long-term partners," and individuals employed by the Suppliers acknowledging that those partners must cooperate as part of their joint effort on Company A's behalf.  *See, e.g.*, ¶ 27(b) (Patel referring to a Supplier's employee who works on Company A's projects as "*partners* [sic] employee") (emphasis added); ¶ 28(e) (Defendant Patel referring to the Suppliers' employees as "[Company A's] long-term partners [sic] employees"); ¶ 27(c) (General Manager of Company B referring in email to Defendants Patel and Wasan to "*our known expectation of [Company A] for the cooperation of the outsource companies . . . .*")

(emphasis added); ¶ 27(d) (Defendant Harvey of Company B referring to the business relationship with Company A as a "joint 'ecosystem'").

The Indictment also alleges that Company A and Company B agreed, "from approximately 2015 through 2017," that Company A would "restrict the hiring and recruiting of engineers and other skilled-labor employees of Company B by Company A," "by agreeing upon periods of time during which Company A would not hire and not recruit Company B employees, with limited exceptions." Ind. ¶ 23. That is, the customer, Company A, allegedly agreed not to steal from Company B, the hand that was feeding it. According to the Indictment, Company A also agreed to restrictions on its hiring of Company B employees "based on the length of their tenure with Company B," Ind. ¶ 24(a), with "limited exceptions." Ind. ¶ 24.

## STATUTORY BACKGROUND

Defendants are charged with a conspiracy to violate Section 1 of the Sherman Act, which makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Despite the statute's expansive language, the Supreme Court has "repeated time and again that § 1 'outlaw[s] only *unreasonable* restraints.'" *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (emphasis added) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). Accordingly, courts reviewing Section 1 claims "presumptively appl[y] rule of reason analysis," *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006), "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after

the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co.*, 522 U.S. at 10.

The Supreme Court has held that "[s]ome types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *Id.* However, "[t]o justify a *per se* prohibition . . . a restraint must have manifestly anticompetitive effects and lack . . . any redeeming virtue." *Leegin*, 551 U.S. at 886 (internal citation and quotation marks omitted); *see also Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58-59 (1977) ("[A] departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing."). Further, application of this strict rule "is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886-87 (internal citations omitted); *see also Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999) ("The Supreme Court is slow to . . . extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.") (internal quotation marks omitted); *Hertz Corp. v. City of N.Y.*, 1 F.3d 121, 129 (2d Cir. 1993) (*per se* treatment is appropriate only "in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue."); *cf. Deslandes v. McDonald's USA, LLC*, No. 17-cv-04857 (JLA), at 8-9 (N.D. Ill. June 28, 2022) ("*Deslandes (June 2022)*") ("This Court cannot say that it has enough experience with no-hire provisions of franchise agreements to predict with confidence that they must always be condemned, which means . . . that the Court must apply rule-of-reason analysis to this case) (citing *NCAA v. Alston*, 141 S. Ct. 2141 (2021)). Controlling precedent bars application

of the *per se* rule when there "might plausibly" be net procompetitive benefits to the relevant restraint. *See California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999) (rule of reason analysis is appropriate where practices "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all"); *see also Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 410 n.5 (2d Cir. 1981) ("[I]n determining that the per se rule does not apply, we need only recognize that the restrictions had sufficient potential to enhance competition, and hence should not be conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry. . . .") (internal quotation marks omitted).

*Per se* analysis is reserved for agreements that are "'horizontal,' *i.e.,* 'agreement[s] between competitors at the same level of the market structure,'" and not agreements that are "'vertical,' *i.e.*, 'combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)); *see also, e.g., Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018) ("Vertical agreements are not per se violations of the antitrust laws."). The Second Circuit has recognized three categories of horizontal conduct as illegal *per se*: price-fixing; bid rigging, "which is simply another 'form of horizontal price fixing[;]'" and allocating markets. *United States v. Aiyer*, 33 F.4th 97, 115 (2d Cir. 2022). Importantly, however, "[e]ven an agreement that falls into a traditional per se category will not receive per se treatment under the Sherman Act unless it is a 'naked' rather than 'ancillary' agreement,"—*i.e.*, unless it has "no purpose except stifling competition." *United States v. DaVita*, 2022 WL 266759, at *2 (D. Colo. Jan. 28, 2022) (quoting *Topco Assocs., Inc.*, 405 U.S. at 608). All other agreements—including those that are ancillary to a "legitimate business collaboration, such as a business association or joint venture"—are

"exempt[ed] . . . from the *per se* rule, [and] the rule of reason applies." *See Aiyer*, 33 F.4th at 115 (internal citation and quotation marks omitted).

Vertical restraints often have strong procompetitive benefits, and require a full assessment of market power and the characteristics of the particular market at issue to assess what harm, if any, may flow from the restraint. *See, e.g., Sylvania*, 433 U.S. at 55 (vertical restrictions can induce investment in capital and labor and encourage the provision of services that improve "a manufacturer's goodwill and the competitiveness of [its] product"); *United States v. Am. Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016) , *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (noting that "legal and economic scholars often view vertical restraints as having procompetitive effects."); *see also Leegin*, 551 U.S. at 882 (same). When a restraint relates to supply of a single product (*i.e.*, the restraint is "intrabrand" as opposed to interbrand)[4] it economically functions as a vertical restraint in that market and "has no effects different from those of vertical restraints that courts routinely sustain." *Illinois Corp. Travel v. American Airlines, Inc.*, 889 F.2d 751, 753 (7th Cir. 1989); *see also Bogan*, 166 F.3d at 515 (noting that competition among general insurance agents operating for same carrier functions more like an intrafirm restraint).

## MOTION TO DISMISS STANDARD

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000); Fed. R. Crim. P.

---

[4] "Interbrand competition is competition among sellers of various brands of the same generic product," whereas "[i]ntrabrand competition is competition among purveyors of the product of a particular manufacturer." *Toshiba*, 663 F.2d at 409 n.4. "Interbrand competition . . . is the primary concern of antitrust law." *Sylvania*, 433 U.S. at 52 n.19; *see also Bogan*, 166 F.3d at 515 ("The agreement here is far from a typical *per se* illegal restraint, consistent with the fact that antitrust law shows more concern to protect inter[] rather than intrabrand competition.").

7(c)(1). "[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012), and thus may be decided "solely upon issues of law." *United States v. Was*, 684 F. Supp. 350, 351 (D. Conn. 1988), *aff'd*, 869 F.2d 34 (2d Cir. 1989). A court must dismiss an indictment that fails to state an offense. *See Pirro*, 212 F.3d at 92-93; Fed. R. Crim. P. 12(b)(3)(B)(v).

Whether to apply the *per se* rule or the rule of reason is a question of law. *See Aiyer*, 33 F.4th at 113 (citing *United States v. Apple, Inc.*, 791 F.3d 290, 313, 321-30 (2d Cir. 2015) (construing argument implicating appropriate analytical framework under the Sherman Act as "question of law" to be reviewed *de novo*)); *see also Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 337 n.3, 354-55 (1982); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1909b (3d ed. 2010); ("[T]he selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by the court.). To the extent a criminal indictment does not allege the elements of a rule-of-reason offense (market power, intent, anticompetitive effect, etc.), but instead alleges only a *per se* offense, it must be dismissed if it fails to state a cognizable *per se* offense under the Sherman Act. *See Aiyer*, 33 F.4th at 117 (charging only a *per se* case forecloses any attempt by government to switch theories during trial).

## ARGUMENT

**I. Given the Absence of Longstanding Judicial Experience Holding No-Poach Agreements to be *Per Se* Violations of the Sherman Act, and That Numerous Courts Have Appropriately Reviewed Such Agreements Under the Rule of Reason, the Restraint Alleged in the Indictment Cannot be Deemed a *Per Se* Offense, Requiring <u>Dismissal</u>.**

The Indictment purports to charge a *per se* violation of the Sherman Act. *See* Ind. ¶ 19. But an indictment's mere invocation of the *per se* label does not mean that the charge must stand. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998); *see also Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989) ("mere talismanic invocation of

the term 'price-fixing' . . . is [not] sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators"). "Typically, alleged restraints on trade challenged under the Sherman Act are analyzed under the rule of reason." *Aiyer*, 33 F.4th at 114 (citations omitted). Whether an indictment's allegations state a *per se* violation is a legal question for this Court to resolve. *See supra* at 11. In making this determination, the question is whether "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *State Oil Co*., 522 U.S. at 10 (quoting *Maricopa Cty*., 457 U.S. at 344). It is "only after considerable experience with certain business relationships that courts classify them as *per se* violations." *Topco Assocs., Inc*., 405 U.S. at 607-08; *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19 n.33 (1979) ("[T]he *per se* rule is not employed until after considerable experience with the type of challenged restraint."); *Eichorn v. AT&T Corp*., 248 F.3d 131, 143 (3d Cir. 2001) ("The Supreme Court has been cautious in extending the *per se* approach to claims that fall outside certain previously enumerated categories of liability.") (citations omitted). And "[w]hen the Courts are uncertain of the competitive significance of a particular type of restraint, they decline to apply the *per se* label." *United States v. Realty Multi-List, Inc*., 629 F.2d 1351, 1365 (5th Cir. 1980).

These principles make clear that the *per se* rule cannot be applied here. There is no "considerable experience" that agreements not to hire or solicit have "manifestly anticompetitive effects and lack . . . any redeeming virtue," *Leegin*, 551 U.S. at 886 (internal citations and quotation marks omitted), whether, as here, in the context of legitimate business collaborations, or otherwise. Neither the Supreme Court nor any court of appeals has held that an agreement not to hire or solicit employees justifies *per se* treatment, let alone such an agreement in the context of a vertical outsourcing services agreement.

In fact, judicial experience in this Circuit has been the opposite. In *Union Circulation Co. v. FTC*, 241 F.2d 652 (2d Cir. 1957), the Court considered the standard to apply to the FTC's challenge to a "no-switching" agreement (*i.e.*, competitors agreeing not to hire from each other's workforce) between agencies engaged in selling periodical subscriptions door-to-door that was designed to address deceptive sales practices.[5] Although there was no business collaboration between the two agencies—other than their claimed effort to reduce deceptive sales practices by their employees—the Court held that the rule of reason—not the *per se* rule—applied.

Forty years later, the Court of Appeals confirmed the vitality of *Union Circulation Co.* in *Bogan,* 166 F.3d 509. There, the Court held that an agreement among an insurance company's general agents not to recruit and hire each other's existing district or sales agents without the consent of the agent's current general agent was not subject to the *per se* rule. In so ruling, the Court acknowledged that the agreement in *Bogan* was an *intra*firm agreement because the six general sales agents all worked for the same insurance company. *Id.* at 515. But the Court then cited *Union Circulation Co.* to explain that its ruling would be no different had the agreement had been an *inter*firm agreement. "Even if the Agreement were interfirm, we still would not afford it *per se* illegal treatment. We have previously identified interagency no-switching agreements as 'distinguishable from [restraints] that have been held illegal *per se*.'" *Id.* (citing *Union Circulation Co.*, 241 F.2d at 657); *see also Ulrich v. Moody's Corp.*, 2014 WL 12776746, at *26 (S.D.N.Y. Mar. 31, 2014), *report and recommendation adopted as modified on other grounds*, 2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014) (applying rule of reason to alleged interfirm no-poach agreement on basis that "'[n]o-hire' or 'no-switching' agreements," have been traditionally

---

[5] In *Union Circulation Co.*, the Court applied Sherman Act standards to a claim under the Federal Trade Commission Act, 15 U.S.C. § 45(a).

"viewed as a subset of covenants not to compete, and for such allegations courts have used the rule of reason rather than the *per se* rule to determine whether or not a plaintiff has sufficiently alleged a cause of action under section 1 of the Sherman Act"); *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014) (applying rule of reason to alleged no-switching agreement between insurance company and competitor authorized to market insurance company's products).[6]

Judicial decisions outside of this Circuit similarly hold. Thus, to the extent there is any judicial consensus concerning no-hire or non-solicitation agreements, it is that they are subject to the rule of reason, not the *per se* standard. *See, e.g., Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102 (9th Cir. 2021) (discussed in Point II *infra*); *Coleman v. Gen. Elec. Co.*, 643 F. Supp. 1229, 1243 (E.D. Tenn. 1986) (rejecting application of *per se* rule to no-hire agreement), *aff'd* 822 F.2d 59 (6th Cir. 1987); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332,

---

[6] District courts that have considered such agreements in the civil context have likewise rejected application of the *per se* rule. *See, e.g.*, *Deslandes (June 2022); Yi v. SK Bakeries, LLC*, 2018 WL 8918587, at *4 (W.D. Wash. Nov. 13, 2018); *Molinari v. Consol. Energy Inc.*, 2012 WL 4928489, at *4 (W.D. Pa. Oct. 16, 2012). Some have permitted additional factual development, observing that ultimately the rule of reason might apply. *See, e.g.*, *Fonseca v. Hewlett-Packard Co.*, 2020 WL 6083448, at *10 (S.D. Cal. Feb. 3, 2020); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039-40 (N.D. Cal. 2013); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012). In one of these cases that later resolved the question after initially reserving judgment, the court declined to apply the *per se* rule. *See Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 2020 WL 2553181, at *13 (S.D. Cal. May 20, 2020). As discussed *infra* in Point II, the Ninth Circuit upheld this ruling. One district court held a no-hire agreement *per se* illegal, but that court's ruling was in the context of a civil case and is contrary to circuit precedent. *See In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Pa. 2019) (relying in part on the government's statement of interest explaining its intent going forward to proceed criminally against "naked" no-poach agreements); *but see Eichorn*, 248 F.3d at 143 (reviewing "the relevant case law" and finding "no support" for the proposition that a "no-hire agreement [i]s *per se* illegal"). We discuss in n.20 *infra* the decision of a court in Colorado—which denied a motion to dismiss in a case alleging non-solicitation agreements—that is not consistent with the aforementioned authority and is plainly distinguishable from the instant case. *DaVita*, 2022 WL 266759. Notably, the court in issuing its pretrial decision, made clear that not all no-poach agreements fall within the *per se* category and that the pleaded naked no-poach agreement could serve as a basis for conviction under the *per se* standard only to the extent that the government proved defendants, through the agreement, intended to allocate a labor market. *Id.* at *8-9.

336-37 (7th Cir. 1967) (remanding for application of rule of reason to alleged "no-switching" agreements).

The virtual absence of cases extending the *per se* rule to no-hire or non-solicitation agreements is not surprising. Such agreements are not obviously anticompetitive. For example, the question whether particular employers wield market power over the labor markets from which their employees are hired is complex. *See Bogan*, 166 F.3d at 515-16; *Coleman*, 643 F. Supp. at 1243-44; *cf. Weisfeld v. Sun Chem. Corp.*, 84 F. App'x 257, 263-64 (3d Cir. 2004) (affirming denial of certification of class of employees of companies that had entered into a "no hire" agreement given variation among employees, including in their skills and responsibilities and their willingness to search for new jobs or "relocate to a distant competitor").

Therefore, and because the Indictment does not allege the elements of a rule-of-reason offense (which requires the pleading of elements such as anticompetitive effect, market power, and/or a particularized likelihood of harm to competition),[7] the Indictment must be dismissed.[8]

---

[7] *See Am. Express Co.*, 838 F.3d at 194-95 (explaining plaintiff's burden in rule of reason case concerning adverse effect on competition).

[8] The Indictment also fails to plead a "restraint of trade" that had "manifestly anticompetitive effects and lack[ed] … any redeeming virtue." *Leegin*, 551 U.S. at 886 (internal quotation marks omitted). The alleged agreement to "allocat[e] employees in the aerospace industry working on projects for Company A," Ind. ¶ 19, *i.e.*, a single company, could not have harmed competition in the labor market in which the alleged coconspirators competed. *See Bogan*, 166 F.3d at 515 (as to alleged labor market limited to life insurance agents with experience at a single company, "a harmful effect upon competition [was] not clearly apparent" and the alleged agreement's "anticompetitive effect on the market for insurance sales agents [was] not obvious[.]"); *see also Coleman*, 643 F. Supp. at 1243 (rejecting *per se* claim; no "stifling of competition," where "the agreement, if it did this much, only precluded the plaintiffs from selling their services to one corporation, and there is no allegation, nor any basis for one, that this prevention had anything more than a de minimis impact on the employment market in general"); *See also Eichorn*, 248 F.3d at 147-48 (by limiting definition of labor market to single firm, plaintiffs proffered an "unrealistic" geographic and product market); *Double D Spotting Service, Inc. v. Supervalu, Inc.*, 136 F.3d 554, 558-61 (8th Cir. 1998) (single firm market not cognizable antitrust market). Indeed, the Indictment concedes that Company A faced large non-conspiring

**II. The Indictment Must be Dismissed Because it Pleads an Agreement That Was Ancillary to a Legitimate Business Collaboration.**

The law recognizes that a restraint such as a no-poach agreement that is ancillary to a legitimate business collaboration, as distinct from a naked restraint, may further the aims of a cooperative venture and thus promise increased economic productivity. The Indictment pleads such a restraint here and thus also must be dismissed under the ancillary restraints doctrine.

**A. Ancillary Restraints are Reviewed Under the Rule of Reason, not the *Per Se* Standard.**

The ancillary restraints doctrine "governs the validity of restrictions imposed by a legitimate business collaboration, such as a business association or joint venture, on nonventure activities" and "exempts such agreements from the *per se* rule, such that the rule of reason applies." *Aiyer*, 33 F.4th at 115-16 (cleaned up); *see also id.* (restraints that are "ancillary to the legitimate and competitive purposes of the business association" are "valid."). Such restraints are analyzed under the rule of reason, not the *per se* standard, because they "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," thus requiring "an inquiry into . . . the combination's actual effect." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *see also Nat'l Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 689 (1978) ("The Rule of Reason . . . has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction.").

---

rivals in the aerospace industry in a labor market not restricted to "employees in the aerospace industry working on projects for Company A." Ind. at ¶ 2 ("Company A was *one of* the largest aerospace engine design, manufacture, and service companies in the United States") (emphasis added); Ind. at ¶ 1 ("Engineers and other skilled-labor employees working in the aerospace industry in the United States"); Ind. at ¶ 4 (describing Companies B-F as "among the Suppliers" who competed with Company A to recruit employees). Given this concession, Defendants' alleged agreement, limited to "employees … working on projects for Company A," Ind. ¶ 19, fails to allege a restraint of trade with "manifestly anticompetitive effects."

"A restraint is ancillary when it *may* contribute to the success of a cooperative venture that promises greater productivity and output"—that is, when it "*arguably*" promotes such ends. *Polk Bros. v. Forest City Enters, Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.) (emphases added). Ancillary restraints are distinguished from "naked" restraints, which may be *per se* invalid. *Aiyer*, 33 F.4th at 115-16 (quoting *Dagher*, 547 U.S. at 7); *see also Polk Bros*., 776 F.2d at 189 (naked restraint only "suppress[es] competition," such as where "two people meet one day and decide not to compete"); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986) ("To be ancillary, and hence exempt from the *per se* rule, an agreement eliminating competition must be subordinate and collateral to a separate, legitimate transaction."); *DaVita*, 2022 WL 266759, at *2 ("Even an agreement that falls into a traditional *per se* category will not receive *per se* treatment under the Sherman Act unless it is a 'naked' rather than 'ancillary' agreement.").

Importantly, a restraint, to be ancillary, need not be "necessary to achieving a joint venture's efficiency-enhancing purpose," but only "plausibly relate[d] to that purpose." *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health System*, 922 F.3d 713, 727 (6th Cir. 2019); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 340 n.11 (2d Cir. 2008) (Sotomayor, J., concurring) ("a challenged restraint" need only be reasonably ancillary, and not "essential" to, the legitimate business collaboration). Courts should not "calibrate degrees of reasonable necessity" because doing so "would make the lawfulness of conduct turn upon judgments of degrees of efficiency." *Rothery*, 792 F.2d at 227-28. Whether "there are better ways to address" externalities arising from a business collaboration or if such "externalities could be eliminated in a substantially less restrictive manner . . . should generally be part of a rule-of-reason analysis." *MLB Props.*, 542 F.3d at 340 n.9 (Sotomayor, J., concurring). And, in that "'[i]t is

sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects,'. . . a court must be *very sure* that a category of acts is anti-competitive before condemning that category *per se*." *Polk Bros.*, 776 F.2d at 189 (emphasis added) (quoting *Copperweld Corp.*, 467 U.S. at 767-68).

Accordingly, "[w]hen a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate, and the rule of reason applies." *Paladin Assoc., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003); *see also MLB Props.*, 542 F.3d at 340 (Sotomayor, J., concurring) (question is whether restraint "*could* have a procompetitive impact related to the efficiency-enhancing purposes" of the enterprise) (emphasis added); *accord Craftsmen Limousine Inc. v. Ford Motor Co.*, 363 F.3d 761, 776 (8th Cir. 2004) ("The issue is not whether the restrictions were procompetitive, but whether they *could* be.") (emphasis in original).

### B. The Alleged Agreement was Ancillary to a Legitimate Business Collaboration, Namely, the Outsource Arrangements Alleged in the Indictment.

The no-poach agreement alleged in the Indictment is a classic ancillary restraint. The outsourcing business model described in the Indictment, including the alleged no-poach term, facilitated the productive output of Company A, a manufacturer of complex jet engines, by, *inter alia*, affording Company A increased control over the planning and execution of projects and delivery cycles and flexibility in the management of its labor expense. The alleged agreements enhanced interbrand competition between Company A and rival jet engine manufacturers and thus promoted economic efficiency. With respect to outsource service providers, the alleged no-poach agreement, *inter alia*, made it more practicable to complete contracted-for tasks on a timely basis; supported Company A's ability to make commitments to future projects; allowed for the recoupment of training and recruitment costs; and mitigated the risk of "disintermediation"

between a customer and supplier (*i.e.*, the process of "eliminat[ing] the middleman"). *See* Point II.C. *infra*.

The alleged agreement thus fits comfortably within the wide variety of recognized cooperative business frameworks, including "[j]oint ventures, mergers, systems of distribution . . . and more,"[9] that feature agreements that are collateral to collaborative business activity, and are thus not *per se* illegal but subject to a rule of reason analysis. *Polk Bros.*, 776 F.2d at 188.[10]

The Indictment's allegations situate the alleged agreement squarely within the ancillary restraints exception to the *per se* rule because the alleged no-poach agreement was allegedly agreed to as part of Company A and its Suppliers' collaborative business activity. While market allocation is one of three recognized *per se* categories, the doctrine of ancillary restraints "exempts such agreements from the per se rule, such that the rule of reason applies." *Aiyer*, 33 F.4th at 115 (cleaned up). The Indictment's mere labelling of the alleged agreement as one to "allocat[e] employees in the aerospace industry working on projects for Company A," Ind. ¶ 19, accordingly, does not change the analysis. The government must support the application of the *per se* standard as a matter of law and cannot do so here. *DaVita*, 2022 WL 266759 at *8 (rejecting argument that all no-poach are *per se* illegal as a matter of law); *see also Bogan*, 166 F.3d at 515 (same); Pts. I, III (explaining that Indictment's alleged restrictions are not *per se*

---

[9] *Aiyer* explained that defendants can invoke the ancillary restraints doctrine even if their business collaboration did not constitute a joint venture. 33 F.4th at 119 n.18 ("similar productive relationship suffices as well") (internal quotation marks omitted).

[10] Courts apply the ancillary restraints analysis to restraints of trade in myriad business settings involving collaborative business activity. In *Med. Ctr.*, for example, the Court concluded that agreements between a jointly operated hospital group and certain health insurers and affiliated physicians not to do business with a particular hospital were reasonably related (and so ancillary) to "the success of [the underlying] cooperative venture." 922 F.3d at 725-27.

illegal).  Here, the Indictment, on its face, alleges that the no-poach agreement was agreed to as part of Company A and its Suppliers' legitimate collaborative business activity.  This means that the alleged agreement squarely falls within the ancillary restraints doctrine.  *See also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1083 (11th Cir. 2016) ("[J]ust because an agreement is capable of being characterized as a market allocation agreement does not mean that the per se rule applies.").

Indeed, courts have viewed restrictions on hiring and solicitation among participants in collaborative business arrangements as ancillary restraints.  These decisions include, for example, cases involving restrictions within a firm or corporate family,[11] franchise relationships,[12] corporate transactions,[13] "no-switching" agreements,[14] and employer-employer covenants not to compete in

---

[11] *E.g.*, *Bogan*, 166 F.3d at 515 (agreement between insurance company's general agents not to recruit and hire each other's district or sales agents without consent of agent's current general agent did "not fit into any of the established per se categories" and therefore was not subject to *per se* rule).

[12] *E.g., Deslandes v. McDonald's USA, LLC*, 2018 WL 3105955, at *7 (N.D. Ill. June 25, 2018) ("Because the restraint alleged in plaintiff's complaint is ancillary to an agreement with a procompetitive effect, the restraint alleged in plaintiff's complaint cannot be deemed unlawful *per se*.").

[13] *E.g., Eichorn*, 248 F.3d at 143 (finding "no support within the relevant case law" for labeling a no-hire agreement as *per se* unlawful in the context of the sale of a business); *see also United States v. Adobe Sys., Inc*., 2011 WL 10883994, at *2 (D.D.C. Mar. 18, 2011) ("[n]othing in Section IV shall prohibit a Defendant . . . from attempting to enter into, entering into, maintaining or enforcing a no direct solicitation provision . . . [that] is reasonably necessary for mergers or acquisitions, consummated or unconsummated, investments, or divestitures, including due diligence related thereto").

[14] *E.g.*, *Union Circulation*, 241 F.2d at 657-58 (rule of reason applied to claim challenging a "no-switching" agreement between agencies engaged in selling periodical subscriptions door-to-door that was designed to eliminate deceptive sales practices); *Ulrich,* 2014 WL 12776746, at *26 ("'No-hire' or 'no-switching' agreements" have been traditionally "viewed as a subset of covenants not to compete, and for such allegations courts have used the rule of reason rather than the per se rule to determine whether or not a plaintiff has sufficiently alleged a cause of action under section 1 of the Sherman Act.").

a variety of contexts.[15]

Notably, in the outsourcing context, in *Aya Healthcare Servs., Inc.*, 9 F.4th 1102 ("*Aya*"), the court ruled that a non-solicitation agreement among outsource nurse staffing agencies was ancillary to a collaborative agreement between the agencies. The agencies provided nurses and nurse technicians to understaffed hospitals, and as one of these agencies, AMN Healthcare, Inc. ("AMN"), grew and was unable to fulfill the demand of its customers for nurse assignments, it contracted with "associate vendors" ("AVs"; in singular, "AV") and referred some of these assignments to other healthcare staffing agencies, including Aya Healthcare Services, Inc. ("Aya"). *Id.* at 1106. The AMN contract included a prohibition on Aya's soliciting AMN's employees. *Id.* After Aya began soliciting AMN nurse recruiters, the parties' relationship deteriorated, and the AV agreement was terminated. *Id.* On appeal of a summary judgment ruling in AMN's favor, Aya asserted that its evidence raised a triable dispute whether AMN's non-solicitation clause constituted a naked restraint of trade, a *per se* violation of Section 1 of the Sherman Act. *Id.* at 1106-07.

Although the court accepted Aya's characterization of the non-solicitation agreement as a horizontal restraint, *id.* at 1109, it rejected Aya's contention that the restraint was subject to *per se* analysis. As the court explained:

> The non-solicitation agreement is necessary to achieving [the] end [of supplying hospitals with traveling nurses] because it ensures that AMN will not lose its personnel during the collaboration. As the district court noted, AMN may want to "guard its investments and establish[] AV relationships with only those agencies that agree, *inter alia*, not to abuse the relationship by proactively raiding AMN's employees, AVs, and customers." Without the restraint, AMN "would likely be less willing or unwilling to deal with other agencies to supply travel nurses to

---

[15] *E.g.*, *Haines v. VeriMed Healthcare Network, LLC*, 613 F. Supp. 2d 1133, 1137-39 (E.D. Mo. 2009) (*per se* rule did not apply to no-hire agreements between a firm and its clients that precluded the clients from hiring the firm's independent contractor; agreement was reasonable under the rule of reason).

hospitals . . . . And with the restraint, AMN may collaborate with its competitor for the benefit of its client without "cutting [its] own throat." [*Polk Bros*., 776 F.2d at 189]. The non-solicitation agreement, therefore, promotes 'competitiveness in the healthcare staffing industry.'. . . Accordingly, the restraint qualifies as an ancillary restraint, which triggers a rule of reason analysis.

*Id*. at 1110 (internal citation and footnote omitted); *see also*, *e.g.*, *Deslandes v. McDonald's USA, LLC*, 2021 WL 3187668, at *6 (N.D. Ill. July 28, 2021) ("*Deslandes (July 2021)*") (alleged no-poach agreement of McDonald's franchisees was ancillary to legitimate "output enhancing" franchise agreements); *Ogden v. Little Caesar Enter., Inc.*, 393 F. Supp. 3d 622, 635 (E.D. Mich. 2019) (declining to apply *per se* analysis to no-poach provision in franchise agreements that "were part of the overall scheme of 'legitimate collaboration' between franchisees operating under the umbrella of the same brand").

Importantly, the *Aya* court also rejected the position of intervening *amicus* the United States of America, which had argued that AMN must satisfy a "less-restrictive-means" test for its non-solicitation agreement to qualify as an ancillary restraint. *Aya*, 9 F.4th at 1111. As the court explained, the less restrictive alternative analysis "falls within the rule-of-reason analysis, not the ancillary restraint consideration." *Id*. Further rejecting the United States' suggestion that the court clarify that the district court "must engage in a distinct reasonable-necessity analysis that includes a less restrictive means consideration," *id.* (internal quotation marks omitted), the court explained that the government's position had no case law support and "conflict[ed] with the Supreme Court's 'reluctance to adopt *per se* rules' in cases 'where the economic impact' of the restraints 'is not *immediately obvious*.'" *Id*. (citing *Leegin*, 551 U.S. at 887) (emphasis in *Aya*; citations omitted).

The *Aya* analysis applies here. The alleged agreement was intended to "allocat[e] employees in the aerospace industry ***working on projects for Company A***," Ind. ¶ 19 (emphasis added), was allegedly described by Defendants and colleagues as related to the collaboration of

Company A and the Suppliers, and was enforced by Patel on behalf of Company A. *See supra* at 6-7; Ind. ¶ 10 (Patel allegedly controlled statements of work and payments to Suppliers); Ind. ¶ 28(d) (Patel allegedly "threaten[ed] to reduce, withhold, and disrupt business transactions between Company A and [Supplier] companies if they did not conform to the agreement . . . by withholding or withdrawing Company A statements of work and purchase orders from [Suppliers]"); Ind. ¶ 22 (Patel "served as a leader and primary enforcer" of alleged agreement). In other words, the Suppliers allegedly agreed to the alleged no-poach agreement because it was important to Company A in the business context of the supply of outsource services to Company A. The alleged agreement, thus, was intertwined with Company A's commercial relationship with its Suppliers. As in *Aya*, accordingly, the alleged agreement was ancillary to the Company A outsource collaboration, and it must be reviewed under the rule of reason.

>    C.   Economic Principles Underlying the Sherman Act Provide a Strong Foundation for Analyzing No-Hire Agreements under the Rule of Reason When They are Part of Legitimate Business Collaborations.

The Sherman Act ancillary restraints doctrine recognizes that the "retention of personnel" carries considerable value in legitimate commercial transactions. Robert Bork, *Ancillary Restraints and the Sherman Act*, 15 ABA ANTITRUST SEC. PROC. 211, 221 (1959). Accordingly, "a covenant not to hire away any of [a] business's key personnel" may be essential to such transactions. *Id.* Recognizing economic reality, courts ruling on hiring restrictions deem them ancillary to commercial transactions where they ensure "workforce continuity" and minimize disruptions. *See, e.g.*, *Eichorn*, 248 F.3d at 146; *see also, e.g.*, *Cesnik v. Chrysler Corp.*, 490 F. Supp. 859, 866-67 (M.D. Tenn. 1980) (no-hiring agreement not illegal *per se* where it helped "secure trained employees who could carry on the business with minimal disruption").

The scholarly literature in labor economics supports these insights. As Nobel laureate economist Gary Becker explains in his seminal work in the field, firms optimally invest in human

capital—whether through training or other knowledge transfer mechanisms—when they can recoup their investment on those employee-development costs. *See* Gary S. Becker, *Investment in Human Capital: A Theoretical Analysis*, 70 J. OF POL. ECON. 5, 11-12 (1962) (hereinafter "Becker"). Because of the significant costs incurred when a trained employee is hired by a competitor, including lost training investment, loss of proprietary information, and costs of training a substitute, some restrictions on employee attrition are often necessary for firms to invest efficiently in human capital, and enable training "that otherwise would not take place." Jonathan M. Barnett & Ted Sichelman, *The Case for Noncompetes*, 87 U. CHI. L. REV. 953, 970-71 (2020).[16] Consistent with these principles, a recent empirical study found that "tighter restrictions on labor mobility lead to higher investment rates," particularly in firms that employ workers in knowledge-intensive occupations. Jessica Jeffers, *The Impact of Restricting Labor Mobility on Corporate Investment and Entrepreneurship* 28 (working paper, Dec. 2019).[17] Moving beyond such scholarly observations, legitimate and procompetitive goals of both purchasers and suppliers of labor can be served by restrictions. In the setting presented by this Indictment, where a purchaser of outsource services is supervising projects related to its own commercial commitments, it is reasonable for the purchaser to seek to avoid the disruption and delay associated with transfers of employees between outsource firms within the purchaser's project-support "ecosystem." Ind. ¶ 27(d). And an outsource supplier, particularly in the specialized industry in which Company A

---

[16] *See also* Paul H. Rubin & Peter Shedd, *Human Capital and Covenants Not to Compete*, 10 J. LEGAL STUD. 93, 96-97 (1981) (arguing that employers will reduce investment in employee training absent restrictions on hiring by competitors); Stewart E. Sterk, *Restraints on Alienation of Human Capital*, 79 VA. L. REV. 383, 393 (1993) (explaining that "without some assurance that employees will perform long-term employment contracts, employers might well underinvest in development of firm-specific human capital").

[17] Another study found that an increase in enforcement of covenants not to compete led to an increase in firm-sponsored training. Evan Starr, *Consider This: Training, Wages and the Enforceability of Covenants Not to Compete*, 72 INDUS. & LABOR REL. REV. 783, 785 (2019).

operates, would reasonably seek to avoid spending significant time and money on training employees to work on Company A's projects, only to see another outsource firm or Company A hire away its trained personnel to continue to perform work on Company A's projects.

Hiring restrictions are particularly important to outsource staffing suppliers. These restrictions promote consistent staffing, allowing the outsource vendor to commit to performing the contracted-for services, and incentivize the outsource firms to invest in recruitment and training. Productivity and firm output are correlated with employees' firm-specific knowledge and experience levels. *See, e.g.*, Hoon S. Cha, David E. Pingry, and Matt E. Thatcher, *Managing the Knowledge Supply Chain: An Organizational Learning Model of Information Technology Offshore Outsourcing*, 32 MIS Q. 2, 284 (2008). In outsourcing arrangements, firms depend on outsourced personnel to retain the knowledge necessary to complete the firm's projects effectively. *Id*. at 293 (observing that disruptions in the "knowledge supply chain" result in a net loss to an outsourcing arrangement and emphasizing "the critical role played by the ability of the [client] firm to capture the learning-by-doing knowledge created by the [outsourcing] firm").

Moreover, no-poach agreements permit collaboration between firms who would not risk "cutting [their] own throat[s]" by entering into such arrangements "unless [they] had received assurances that [the other party] would not compete" by free-riding on their investment in human capital. *Polk Bros.*, 776 F.2d at 189-90 ("The Supreme Court has recognized that the control of free riding is a legitimate objective . . . ."). *See also Sylvania,* 433 U.S. at 55 ("Because of market imperfections such as the so-called 'free rider' effect, [certain] services might not be provided . . . in a purely competitive situation . . . ."); *Rothery*, 792 F.2d at 223, 229 (applying rule of reason and approving horizontal restraints intended "to counter the perceived menace that free riding poses . . . [and] enhance consumer welfare by creating efficiency"). Indeed, as courts have

repeatedly explained, preventing free riding can increase competition. *See Leegin,* 551 U.S. at 890-91 (preventing free riding can increase competition); *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 43 (2d Cir. 2018) ("Eliminating free riders can be a procompetitive advantage of alleged restraints on competition . . . ."); *Madison Square Garden, L.P. v. National Hockey League,* 2007 WL 3254421, at *9 (S.D.N.Y. Nov. 2, 2007), aff'd, 270 F. App'x 56 (2d Cir. 2008) (preventing free riding is a procompetitive purpose).

In the outsourcing context, the risk of free riding is heightened. First, as Becker has explained, firms are typically incentivized to invest in firm-specific (as opposed to generally applicable) training because there is less risk of losing that investment to competing firms. *See* Becker at 12-13, 17-18. *See also* Ronen Avraham, K. A. D. Camara, *The Tragedy of the Human Commons*, 29 CARDOZO L. REV. 479, 483 (2007) (explaining that risks of free riding on generally applicable training can lead to an "underinvestment in [employee] education"); Edmund W. Kitch, *The Law and Economics of Rights in Valuable Information*, 9 THE J. OF LEGAL STUD. 4, 711-12 (1980).[18] Where, in the outsourcing context, training is specific to the outsourcing client and is valuable to other outsourcing firms servicing the common client, the risk is enhanced that outsourcing firms will try to free ride by hiring away competitors' employees who have experience and training tailored to their common customer. Absent hiring restrictions, the know-how accumulated by an employee working on projects for an outsourcing client could be appropriated by competitors who could employ that worker for the same

---

[18] *See also Sweeney v. Pence*, 767 F.3d 654, 673 (7th Cir. 2014) (Wood, dissenting) ("Free-riding is a potential problem whenever a collective good . . . is involved.") (citing Earl R. Brubaker, *Free Ride, Free Revelation, or Golden Rule?* 18 J.L. & ECON. 147, 149-50 (1975), and Russell B. Korobkin & Thomas S. Ulen, *Law and Behavioral Science: Removing the Rationality Assumption from Law and Economics*, 88 CALIF. L. REV. 1051, 1139 (2000)).

outsourcing client. Hiring restrictions in such a setting foster investment by allowing employers to recoup their investment in "training related to the brand," which would otherwise be subject to "free riding" by "other outlets" servicing that same brand. *Deslandes (July 2021)* at \*9 (crediting analysis based on Becker's distinction between general and specific training).

Second, free riding is pernicious in the staffing or outsourcing context where suppliers may be excluded from the market entirely through "disintermediation"—*i.e.*, the process of "eliminat[ing] the middleman" through "direct solicitation, negotiation and contracting between the firm and the worker." *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1558-59 (11th Cir. 1983) ("The covenant between [defendants] not to hire one another's employees . . . [was] clearly crafted" to protect a company from "the ravages of opportunistic disintermediation"). *See also HR Staffing Consultants LLC v. Butts*, 627 Fed. App'x 168, 172 (3d Cir. 2015) ("[B]ecause the non-compete helps prevent disintermediation, enforcing it is reasonable."). Notably, because a staffing or outsourcing firm's business model is based on its ability to serve as a middleman, preventing disintermediation or poaching of employees by a competitor "is essential to its very existence" and "business model." *Id*. at 173-74.

> D. Until the Apparent Change in Course Reflected by the Return of this Indictment, the Government Agreed That in the Context of Legitimate Business Collaborations, Ancillary No-Hire Agreements Should be Assessed Under the <u>Rule of Reason</u>.

Until the apparent change in course reflected by the return of the Indictment in this case, the authorities that enforce the Sherman Act, including DOJ, appeared to have agreed with the above principles regarding ancillary no-poach agreements. Thus, in its 2011 settlement of a civil case involving alleged no-poach agreements, the DOJ spearheaded a final judgment and order that expressly exempted from the category of "Prohibited Conduct" any non-solicitation provisions "reasonably necessary for contracts with," *inter alia*, "outsourcing vendors." *Adobe*, 2011 WL

10883994, at *2 .  In 2016, when DOJ and the FTC published joint guidance for human resource professionals, the agencies identified only "naked" no-poach agreements as *per se* illegal, recognizing that such agreements fall outside the *per se* rule if ancillary to legitimate business collaborations.  *See* U.S. Dep't. of Justice, Antitrust Division & Federal Trade Commission, *Antitrust Guidance for Human Resource Prof'ls* (Oct. 2016) ("2016 Guidance") at 3.[19]  To provide additional insight into the government's thinking, it provided seven examples of factual scenarios, including potential no-poach agreements, that might trigger criminal liability.  *Id.* at 6-9.  None included a no-hire or non-solicitation agreement in the context of a legitimate business collaboration.  Further addressing the issue, representatives of the FTC explained that where a firm "collaborates with other firms as part of a legitimate collaborative activity, no-poaching agreements or other restraints on recruiting workers may be reasonably necessary to that undertaking."  *See* Debbie Feinstein, et al., Fed. Trade Comm'n, Office of Policy Planning, *Competitive job markets offer more than just fringe benefits* (Oct. 20, 2016), https://www.ftc.gov/enforcement/competition-matters/2016/10/competitive-job-markets-offer-more-just-fringe-benefits. This statement specifically included "outsourcing vendors" in a list of examples of legitimate collaborations that do not present inherent antitrust risk.  *Id.*  And in a 2018 civil settlement involving no-poach conduct, DOJ entered into a final judgment that expressly exempted from the category of "Prohibited Conduct" "a reasonable Agreement not to solicit,

___

[19] *See also* Corrected Statement of Interest of the United States at 11, *Stigar v. Dough Dough, Inc.*, No. 18-cv-244 (E.D. Wash. Mar. 8, 2019), ECF No. 34 (conceding that "[t]he per se rule does not apply to all no-hire and no-solicitation agreements"); Corrected Statement of Interest of the United States at 11, *Richmond v. Bergey Pullman Inc.*, No. 18-cv-246 (E.D. Wash. Mar. 8, 2019), ECF No. 45 (same); Corrected Statement of Interest of the United States at 11, *Harris v. CJ Star, LLC*, No. 18-cv-247 (E.D. Wash. Mar. 8, 2019), ECF No. 38 (same).

recruit, or hire employees that is ancillary to a legitimate business collaboration." *United States v. Knorr-Bremse AG.*, 2018 WL 4386565, at *2 (D.D.C. July 11, 2018).

Nor do the recent cases brought by DOJ charging no-poach and non-solicitation agreements as *per se* violations of the Sherman Act (one of which has been rejected by a jury[20] and three of which remain pending) reflect a different DOJ posture concerning no-poach agreements as part an outsourcing arrangement. None of those cases involves allegations of no-poach or non-solicitation agreements as part of a legitimate business collaboration. In fact, in two of the cases, DOJ confirmed its view that no-poach agreements that are part of such collaborations fall outside the *per se* rule. In *United States v. DaVita*, for example, the government conceded in oral argument that a no-poaching agreement that "was subordinate and collateral to a legitimate business collaboration and if the agreement was necessary to further that legitimate business collaboration" may escape *per se* classification, but argued that the alleged no-poach agreement in the *DaVita* case was subject to the *per se* rule because "[t]here is no business context here" that could serve that role and "save an agreement amongst employe[r]s not to compete for employees." Reporter's Tr., Oral Argument at 38:11-13; 38:22-23, *United States v. DaVita*, No. 21-cr-229 (D. Colo. Nov. 19, 2021). Similarly, in *United States v. Hee*, the government argued that "Defendants' theory collapses out of the gate because they identify no allegations indicating that the conspirators themselves carried out a legitimate transaction or venture to which the no-poach restraint could be

---

[20] On April 15, 2022, a jury in the District of Colorado acquitted a company that operated outpatient medical care facilities and its CEO of all charges that they conspired with competitors not to solicit each other's employees across the United States. *See* Verdict, *United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo. Apr. 15, 2022), ECF No. 264. The government also brought in December 2020 its first criminal wage-fixing case, *United States v. Jindal*; on April 14, 2022, a jury in the Eastern District of Texas acquitted two defendants on all antitrust charges. *See* Verdict, *United States v. Jindal*, No. 20-cr-358 (E.D. Tex. Apr. 14, 2022), ECF No. 112. Notably, the government's policy-driven prosecutions to date have yielded four acquittals.

subordinate and collateral." *See* Gov't Opp'n to Mot. to Dismiss at 16, *United States v. Hee*, No. 21-cr-98 (D. Nev. Oct. 1, 2021), ECF No. 47. The government asserted that because "[n]othing of the sort can be gleaned from [the] face of the indictment . . . [t]hat is the end of the analysis." *Id*.

Here of course, the Indictment expressly situates the alleged no-poach agreement in the heart of Company A's outsourcing arrangements with the Suppliers, the legitimate business collaboration that the government asserted was missing in *DaVita* and *Hee*. The Indictment alleges that Company A "***relied*** upon . . . outsource engineering" from the Suppliers to "design, manufacture, and service its aerospace products." Ind. ¶¶ 2, 4 (emphasis added). Suppliers each "entered into a contract with . . . Company A, to complete a particular project" and "assigned engineers and other skilled workers from among its own employees to complete that project." Ind. ¶¶ 3, 4. Overseeing the outsourcing arrangement, Company A and its parent company through Patel allegedly "controlled the statements of work," entered into "master contract[s]" with Suppliers, set the "maximum pricing charged" by each Supplier," and "monitored the quality" of Supplier "work and progress on their projects for Company A." Ind. ¶ 10. The alleged no-poach agreement applied only to engineers and other skilled-labor employees "working on projects for Company A." Ind. ¶ 19. The alleged agreement addressed concerns that "hiring of [Suppliers'] resources puts pressure on [Suppliers] and [Company A's] ability to contain labor cost increases in [their] joint 'ecosystem.'" Ind. ¶ 27(d).

Accordingly, under the government's own previous statements, the alleged restraint is subject to the rule of reason standard, not the *per se* rule charged in the Indictment, which should be dismissed. *See Aiyer*, 33 F.4th at 117 (indictment charging only a *per se* antitrust violation "foreclose[s] any . . . attempt to switch theories"); *see also Jindal*, 2021 WL 5578687, at *4

(indictment charging *per se* violation "can only stand if the allegations in it constitute a *per se* violation of the Sherman Act").

### III.  The Vertical Relationship Between Company A and the Outsource Suppliers Further Precludes Characterizing the Alleged Restraint as a *Per Se* Violation.

The Indictment alleges an agreement "to suppress competition by allocating employees in the aerospace industry working on projects for Company A, specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies **A**-F in the United States."  Ind. ¶ 19 (emphasis added).  The Indictment also alleges an agreement between Company A and Company B pursuant to which Company A would "restrict the hiring and recruiting of engineers and other skilled-labor employees of Company B by Company A" "by agreeing on periods of time during which Company A would not hire and recruit Company B employees, with limited exceptions."  Ind. ¶ 23.  Because these allegations plead hybrid vertical-horizontal restraints in the context of intra-brand relationships, and, in the case of the Company A-Company B alleged agreement, a classic vertical agreement, they must be judged under the rule of reason.  On this basis as well, the Indictment must be dismissed.

#### A.  As a Hybrid Vertical-Horizontal Alleged Arrangement, the Charged No-Poach Agreement Must be Evaluated Under the Rule of Reason.

Restraints between vertical market participants, such as customers and suppliers, are analyzed under the rule of reason even where the entities also compete horizontally at another level of the market.  *See, e.g.*, *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (collecting cases where courts have applied rule of reason analysis to vertical restraints despite competition at horizontal level); *AT&T Corp. v. JMC Telecom., LLC*, 470 F.3d 525, 531 (3d Cir. 2006) ("Vertical restraints are generally not *per se* violations of the Sherman Act, even where a distributor and manufacturer also compete at the distribution level, *i.e.,* have some form of horizontal relationship (a/k/a/ dual distributor arrangement), as is the

case here."); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1230-31 (8th Cir. 1987) (collecting cases and applying rule of reason to nonprice restraints in dual distribution context, "mindful of the Supreme Court's directive that we depart from the rule of reason only 'upon demonstrable economic effect rather than[] . . . upon formalistic line drawing'") (quoting *Sylvania*, 433 U.S. at 59).

"[A]s the Supreme Court has observed, the analysis of any agreement having some vertical component is complex and not amenable to a *per se* approach." *Ogden*, 393 F. Supp. 3d at 634. Courts accordingly deem allegations involving "mixed" horizontal and vertical relationships subject to the rule of reason. *See, e.g.*, *2238 Victory Corp. v. Fjallraven USA Retail, LLC*, 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021) ("Because the Complaint describes a mixed vertical and horizontal relationship between Fjallraven and Netrush, any agreement between them is scrutinized under the rule of reason and is not categorized as per se unlawful under the Sherman Act.").[21] "In a similar vein, the Areeda treatise recommends defaulting to an analysis under the rule of reason when alleged conduct seems to have some characteristics of both horizontal and vertical restraints." *In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 136 (D.D.C. 2016) (citing

---

[21] *See also, e.g.*, In re Mushroom Direct Purchaser Antitrust Litig., 2015 WL 6322383, at *14 (E.D. Pa. May 26, 2015) ("Because I am unable to untangle the vertical and horizontal aspects of the conduct of the integrated defendants in the alleged conspiracy to fix mushroom distribution prices, I find that it is appropriate to apply the rule of reason to the entirety of plaintiffs' claim that defendants violated Section 1 of the Sherman Act by 'conspir[ing] among themselves and in conjunction with nonmember distributors to set artificially-inflated prices' for mushrooms."); *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) ("[B]ecause Plaintiff has pled that the parties to the alleged agreement have a relationship with both horizontal and vertical elements, Plaintiff's Sherman Act claim must be evaluated under the rule of reason."); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 Fed. App'x 29, 29 (2d Cir. 2002) (summary order) ("Contrary to Beyer's argument on appeal, Beyer alleged in its complaint that Elmhurst and Bartlett were engaged in a dual-distributorship relationship, or both a vertical and horizontal relationship. Had Beyer alleged a purely horizontal relationship between Elmhurst and Bartlett, Beyer would have alleged a per se violation of § 1 of the Sherman Act. Because Beyer did not so plead, its complaint was subject to scrutiny under the 'rule of reason.'").

Areeda ¶ 1605a, and concluding that where the alleged agreement "presents both a new type of

conduct for which there is no prior analysis and a relationship that arguably has both horizontal

and vertical aspects . . . . it should be analyzed under the rule of reason"), *amended on*

*reconsideration sub nom. In re: McCormick & Co., Inc., Pepper Prods. Mktg. & Sales Practices*

*Litig.*, 275 F. Supp. 3d 218 (D.D.C. 2017); *see also Deslandes (June 2022)* at 9 ("Thus, though the

restraint as alleged in the plaintiffs' respective complaints had horizontal elements . . . the restraint

is not *per se* unlawful because it 'may contribute to the success of a cooperative venture that

promises greater productivity and output.'") (quoting *Polk Bros.*, 776 F.2d at 189).[22]

Here, the Indictment alleges a vertical relationship between Company A, on the one hand,

and Companies B-F, on the other. Companies B through F "were among the Suppliers whose

employees worked on projects for Company A on an outsource basis." Ind. ¶ 4. "[I]n an outsource

arrangement, an outsource engineering supplier ('Supplier') entered into a contract with a

customer, such as Company A, to complete a particular project, assigned engineers and other

---

[22] It is inapposite that the Supreme Court and this circuit have applied the *per se* rule to "hub and spoke" conspiracies, for example in *Apple.* 791 F.3d at 327-29. In *Apple*, the Court applied the *per se* rule despite Apple's vertical relationship with eBook publishers because the conspiracy among them sought to reduce competition by improperly disadvantaging Apple's competitor, Amazon. *Id.* at 321-23. The Court followed the Supreme Court's guidance in two hub and spoke conspiracy cases, one where a retailer colluded with its vertically related distributors "to have those companies boycott a competing retailer", *id.* at 322 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)), and another where a car manufacturer colluded with vertically related dealers "to prevent other dealers from selling cars at discount prices." *Id.* (citing *United States v. General Motors Corp.*, 384 U.S. 127 (1966)). Here, the government has not alleged that the alleged agreement suppressed competition by disadvantaging Company A's aerospace engine manufacturing rivals or the Suppliers' outsourcing rivals. Indeed, it has excluded the possibility of such *per se* unlawful anticompetitive restraints by restricting its allegations to "employees working on projects for Company A." Ind. ¶ 19. This restriction furthered the vertical relationship between Company A and Suppliers B-F, necessitating rule of reason treatment, and clearly distinguishes the vertical element of the alleged agreement from "situations in which a vertical player organizes a horizontal cartel" which are subject to *per se* analysis. *Apple*, 791 F.3d at 323.

skilled workers from among its own employees to complete that project, and then received an agreed-upon payment from the customer for such work." Ind. ¶ 3. "The Supplier was responsible for paying salary and benefits to its employees who worked on outsource projects, as well as for recruiting and hiring a sufficient number of employees with sufficient qualifications to complete the Supplier's outsourced projects." Ind. ¶ 3. According to the Indictment, Mr. Patel, on behalf of Company A, "controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Company A." Ind ¶ 10. As noted, the hiring restriction alleged by the government is confined to "employees in the aerospace industry working on projects for Company A," Ind ¶ 19—in other words, employees of Suppliers who were under contract to work for their common customer, Company A.

As a consequence, the alleged restraint existed in and furthered a vertical relationship between Company A and each of Companies B through F. This remains the case notwithstanding that Company A allegedly competed horizontally in the labor market with Companies B-F. The alleged hiring restrictions were designed for the purpose of facilitating work on "projects for Company A," Ind. ¶ 19, in which employees of Companies B-F were engaged.[23] The hiring restrictions were thus tied to the increased output associated with the completion of "Company A's projects." As such, the rule of reason applies to the analysis of the restraint alleged in the Indictment.

> B. Because the Alleged Vertical Restriction Functions as an Intrabrand Restraint, the <u>Rule of Reason Applies</u>.

The Supreme Court has recognized that "[t]he market impact of vertical restrictions is complex because of their potential for a simultaneous reduction of intrabrand competition and

---

[23] In contrast, in the case of a horizontal cartel alone, there would be no reason to limit the hiring restrictions to those Company B-F employees actively supporting Company A projects.

stimulation of interbrand competition." *Sylvania*, 433 U.S. at 51 (footnote omitted). "Interbrand competition is competition among sellers of various brands of the same generic product," whereas "[i]ntrabrand competition is competition among purveyors of the product of a particular manufacturer." *Toshiba Am., Inc.*, 663 F.2d at 409 n.4. "Interbrand competition . . . is the primary concern of antitrust law." *Sylvania*, 433 U.S. at 52 n.19; *see also Bogan,* 166 F.3d at 515 ("The agreement here is far from a typical *per se* illegal restraint, consistent with the fact that antitrust law shows more concern to protect inter[]rather than intrabrand competition.").

"Restrictions on intrabrand competition can actually enhance market-wide competition by fostering vertical efficiency and maintaining the desired quality of a product." *Success Systems, Inc. v. Excentus Corp.*, 439 F. Supp. 3d 31, 64 (D. Conn. 2020) (Bolden, J.) (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co*, 61 F.3d 123, 127-28 (2d Cir. 1995)). Thus, an intrabrand restraint's tendency to foster interbrand competition is another factor that precludes *per se* treatment. *See, e.g.*, *Ogden*, 393 F. Supp. 3d at 634 (citing procompetitive efficiencies achieved by vertical restriction between franchisor and franchisees and concluding that such "concerns weigh in favor of the application of a rule of reason here, where the no-poaching clause explicitly prohibits only intrabrand hiring"); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021) (concluding, in denying certification of putative class action challenging no-poach provision in franchise agreement, that "[t]he rule of reason applies in this monopsony case challenging a nationwide franchise's use of intrabrand restraints that were arguably 'designed to help [the company] more effectively compete with other brands by ensuring cooperation and collegiality among franchisees, and by encouraging investment in training'").

The alleged hiring restrictions here, which were confined to "employees in the aerospace industry working on projects for Company A," Ind. ¶ 19, were effectively an intrabrand restraint

that fostered interbrand competition.[24]   For this reason, as well, the rule of reason is the only

appropriate method for analyzing the legality of the alleged restraint.

C. The Alleged Vertical Agreement Under Which Company A Agreed at
Times not to Hire Engineers Employed by Company B is Also a Vertical
<u>Restraint of Trade Subject to the Rule of Reason</u>.

The Indictment alleges also that Company A and Supplier B defendants Messrs. Harvey

and Wasan, from approximately 2015 through 2017, agreed to restrict the hiring and recruiting of

engineers and other skilled-labor employees of Company B by Company A "by agreeing upon

periods of time during which Company A would not hire and recruit Company B employees, with

limited exceptions."  Ind. ¶ 23.  It alleges further that in or around September 2011, the same

companies agreed that "Company A would not hire engineers and other skilled-labor employees

of Company B who had not yet worked for Company B for a certain length of time," described as

24 months, or a "min. 24 months."  Ind. ¶ 24(a)-(b).

For the reasons described above, the vertical nature of this alleged agreement—between  a

purchaser of services and a seller of services—requires that these allegations be analyzed under

the rule of reason.   The Supreme Court has repeatedly overruled cases that extended the *per se*

rule to such vertical contexts, as time and experience have eroded the faulty assumptions on which

they were based.  *See, e.g.*, *Leegin*, 551 U.S. at 881-82 (overruling *Dr. Miles Med. Co. v. John D.

Park & Sons Co.*, 220 U.S. 373 (1911) to hold that rule of reason applies to vertical minimum

---

[24]      In *Aya,* discussed *supra* at Point II.B., the government acknowledged that
intrabrand restraints are often procompetitive, vertical relationships but argued that *Aya
Healthcare* involved a *horizontal* restraint because it was not "purely intrabrand."  Br. of Amicus
United States in Support of Neither Party at 18-19, *Aya Healthcare Servs., Inc. v. AMN Healthcare,
Inc.*, No. 20-55679 (9th Cir. Nov. 19, 2020), ECF No. 14.  Here, as discussed above, the allegations
in the Indictment allege a vertical restraint limited to labor assigned to Company A projects.  Ind.
¶ 19.

.

resale price maintenance); *State Oil Co.*, 522 U.S. at 7 (overruling *Albrecht v. Herald Co*., 390 U.S. 145 (1968) to hold that rule of reason applies to vertical maximum resale prices); *Sylvania*, 433 U.S. at 57-58 (overruling *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365 (1967) to hold that rule of reason applies to non-price vertical restraints).

Given this black letter law and the contemporary market economic analysis it reflects, Company A's determination to support the viability of a supplier of staffing services by allegedly agreeing to refrain from hiring the supplier's employees in distinct periods during which the supplier, as here, was staffing its employees on Company A outsourced projects, cannot be subjected to *per se* analysis.

**IV.** **The Absence of Notice Requires Dismissal Under the Due Process Clause.**

    A. Application of the *Per Se* Rule to the Charged Agreement Would Violate Due Process.

The application of the *per se* standard to a no-poach agreement by and among parties engaged in a legitimate business collaboration, as here, would violate Defendants' constitutional right to "fair warning" that the alleged conduct is a crime. *United States v. Lanier*, 520 U.S. 259, 266 (1997). Accordingly, the Indictment should also be dismissed as a violation of Due Process.

The Fifth Amendment provides that "[n]o person shall … be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Due Process Clause enshrines the "basic principle that a criminal statute must give fair warning of the conduct that it makes a crime," such that "'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964), (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)). Due process "guards against arbitrary or discriminatory law enforcement by insisting that a statute"—or established judicial precedent—"provide standards to govern the actions of police officers, prosecutors, juries, and

judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). For this reason, due process "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope[.]" *Lanier*, 520 U.S. at 266. Criminal liability cannot turn on violation of a *per se* rule that, prior to return of the Indictment, was not previously established. Here, because judicial decisions had not recognized the alleged conduct as a *per se* violation of the Sherman Act, Defendants lacked constitutional notice that their alleged conduct was illegal, and the Indictment, as a result, must be dismissed.

The Sherman Act itself does not provide notice for due process purposes because it "does not, in clear and categorical terms, precisely identify the conduct which it proscribes." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978). Rather, the Sherman Act prohibits behavior that "is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct." *Id.* at 440-41. Imposing criminal liability for "conduct which only after the fact is determined to violate the statute because of anticompetitive effects" implicates substantial due process concerns. *Id.* at 441. Given these due process concerns, the government has long recognized that it may criminally prosecute only *per se* violations of the Sherman Act, *i.e.*, agreements that long judicial experience recognizes are virtually always anticompetitive. *See Aiyer*, 33 F. 4th at 117 (noting that "the government does not pursue criminal charges under the rule of reason as a matter of policy").

Notwithstanding that established judicial construction of the Sherman Act may supply the fair notice that the text of the statute itself lacks, it would violate due process were criminal liability imposed under the Act in the absence of prior judicial decisions identifying the charged offense conduct as a *per se* violation. Criminal prosecution may only be grounded on violations of established rules made known to all. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)

(explaining that laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.  Vague laws may trap the innocent by not providing fair warning").  Thus, absent a clear judicial consensus that a practice is so inherently anticompetitive that it should be characterized as *per se* illegal under the Sherman Act, those subject to the law lack adequate notice that by engaging in such conduct they are crossing a criminal line.  *See Skilling v. United States*, 561 U.S. 358, 408 (2010) (addressing vagueness challenge to honest services fraud statute, and declining to extend the statute to applications beyond cases involving bribes and kickbacks because, "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine").

Although the Indictment seeks to shoehorn the agreement alleged into an established *per se* category by affixing the label of "market allocation," prior to return of the Indictment in December 2021, no appellate court had applied the *per se* rule to an alleged no-poach, non-solicitation agreement.  To the contrary, as described above, Second Circuit rulings had applied the rule of reason to such agreements.  *See Bogan*, 166 F.3d at 515-16; *Union Circulation Co.*, 241 F.2d at 657 (discussed supra at Point I).  Even the government's 2016 Guidance and subsequent policy statements have exempted conduct of the kind that is alleged here from *per se* treatment and criminal prosecution.  Moreover, the government issued the 2016 Guidance, in which the government first announced that it intended to prosecute no-poach agreements (but only those that had no redeeming purpose—*i.e.*, "naked" agreements), more than *five years after* the alleged onset of the alleged conspiracy.  In view of these opinions, and the government's own prior guidance, a

person of ordinary intelligence could not have been on notice that agreements like those alleged here constituted *per se* violations of the Sherman Act.[25]

The potential practical implications of application of a novel *per se* theory in a criminal prosecution further underscore the resulting due process violation. A *per se* designation can affect every aspect of a criminal case, from discovery obligations to evidentiary rulings to post-trial analysis. The government's consistent position in cases like this one is that pursuant to the *per se* rule (a) it need only prove that Defendants intentionally entered an agreement not to hire one another's engineers and would not be required to prove that Defendants intended such conduct to cause anticompetitive effects, and (b) Defendants would be barred from introducing proof of procompetitive justifications for the alleged conduct. *See* United States' Omnibus Mot. in *Limine* at 3-4, *United States v. Jindal*, No. 20-cr-358 (E.D. Tex. Mar. 28, 2022), ECF No. 73 (arguing that because the judge denied defendants' motion to dismiss and held that the Indictment alleged a *per se* violation, evidence of pro-competitive benefits or reasonableness should be excluded from trial as irrelevant); United States' Omnibus Mot. in *Limine* at 4, *United States v. DaVita*, No. 21-cr-229

---

[25] Undeterred by precedent or principles of Due Process or limitations on its authority to define new crimes, DOJ, in an attempt to broaden the judicially imposed limits on *per se* designations under the Sherman Act, has brought five "first of their kind" criminal cases between 2021 and early 2022, alleging that no-poach agreements are *per se* illegal (*i.e.*, this case; Indictment, *United States v. Surgical Care Affiliates, LLC*, No. 21-cr-11 (N.D. Tex. Jan. 5, 2021); Indictment, *United States v. Hee*, No. 21-cr-98 (D. Nev. Mar. 30, 2021); Indictment, *United States v. DaVita, Inc.*, No. 21-cr-229 (D. Colo. July 14, 2021); and Indictment, *United States v. Manahe*, No. 22-cr-13 (D. Me. Jan. 27, 2022) (alleging no-hire agreement and wage fixing)). Indeed, it appears that even in the context of vertical agreements containing employment restrictions, which are virtually all subject to the rule of reason, the government may be seeking an even broader expansion of the law. *Compare* Corrected Statement of Interest of the United States at 15, *Dough Dough, Inc.*, No. 18-cv-244 (explaining DOJ view that no-hire restrictions imposed in context of a vertical franchisee relationship should be evaluated under the rule of reason), *with* United States' Mot. for Leave to File Statement of Interest at 1, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857 (N.D. Ill. Feb. 17, 2022), ECF No. 446 ("The Statement of Interest in *Stigar . . .* does not fully and accurately reflect the United States' current views.").

(D. Colo. Dec. 17, 2021), ECF No. 107 (arguing that "[b]ecause the Indictment alleges *per se* unlawful agreements . . . the Court should exclude evidence and argument that the conspiracy was either justified by procompetitive or other reasons or did not result in harmful effects as irrelevant"); *see also* United States' Opp'n to Defs.' Mot. to Dismiss the Indictment at 6, *United States v. Manahe*, No. 22-cr-13 (D. Me. June 21, 2022), ECF No. 89 (arguing that "in *per se* cases, the question for the jury—in either a criminal or civil antitrust case—is simply whether the *per se* unlawful agreement, that is, the unreasonable agreement in restraint of trade, occurred"). For example, in the recent case *United States v. DaVita,* the government sought a jury instruction that the government need not prove that the defendants specifically intended to restrain trade or harm competition through their alleged no-poach agreement. United States' Mem. in Support of Disputed Proposed Jury Instrs. at 12, *United States v. DaVita*, No. 21-cr-229 (D. Colo. Feb. 22, 2022), ECF No. 178. The government reiterated these positions in a recent filing, arguing that the *per se* rule precludes evidence regarding defendant's intent to restrain trade and is not a question for the jury and that the *DaVita* court erred in requiring proof that defendants intended to restrain trade and in admitting evidence of defendants' purposes unrelated to allocating the market. United States' Resp. to Def. VDA OC, LLC's Notice of Addt'l Authority at 3-4, *United States v. Hee*, No. 21-cr-98 (D. Nev. May 11, 2022), ECF No. 89.

Thus, if the Court permits the Indictment to stand, and accepts the government's characterization of an alleged no-poach agreement within an outsourcing arrangement as *per se* illegal, it would, under the government's position, potentially limit the triable issues to whether the agreement existed and whether Defendants intentionally entered the agreement. This would mean that Defendants would not only be tried without notice that their conduct was criminal but

also would be hamstrung in defending their conduct consistent with precedent.[26]  Rather than

accept the government's invitation to be the first court to apply a *per se* designation to no-poach

agreements in the context of outsource arrangements and proceed to trial under an incorrect

application of the *per se* framework, the Court should dismiss the Indictment and thus permit the

government, if it chooses, to seek appellate review of the threshold question whether a *per se* or

rule-of-reason analysis governs this case.

> B. *Per Se* Designations Must be Recognized by Considerable Judicial Experience
>    and May Not be Expanded by Executive Branch "Guidance."

Congress alone, by means of statutes interpreted by the courts, is empowered to define

crimes.  The Executive Branch may not declare new offenses by rule or policy decision.  Thus, the

Executive Branch's 2016 Guidance, in which DOJ announced its intention "to proceed criminally

against naked … no-poaching agreements," cannot provide the "fair warning" required under the

Due Process Clause that naked no-poach agreements violate the Sherman Act on a *per se* basis.

2016 Guidance at 4.

The DOJ and the FTC do not possess the authority unilaterally to declare that conduct is

criminal or *per se* illegal under the Sherman Act.  *See Krzalic v. Republic Title Co.*, 314 F.3d 875,

883 (7th Cir. 2002) (Easterbrook, J., concurring) ("[j]udges do not apply *Chevron* to the Attorney

General's interpretation of the Sherman Antitrust Act"); *Aya*, 2020 WL 2553181, at *13 (S.D. Cal.

May 20, 2020) ("DOJ's policy is not binding authority").  As discussed above, courts, not the DOJ,

determine what constitutes a *per se* violation of the Sherman Act.  *See Leegin*, 551 U.S. at 886

---

[26] Troubled by the implications of the government's *per se* argument in *United States v. DaVita*, the first criminal no-poach case to be tried nationwide (in a context where the defense did not, as here, assert an ancillary restraint defense), the district court, although declining to dismiss the case outright, required the government to prove to the jury that the defendants intended to unreasonably restrain trade by allocating the market.  Jury Instr. at 15, *United States v. DaVita*, No. 21-cr-229 (D. Colo. Apr. 13, 2022), ECF No. 254.  The jury acquitted.

("[T]he *per se* rule is appropriate only after *courts* have had considerable experience with the type of restraint at issue, and only if *courts* can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason.") (second and third emphases added) (citations omitted); *Topco Assocs., Inc.*, 405 U.S. at 607-08 ("It is only after considerable experience with certain business relationships that *courts* classify them as *per se* violations of the Sherman Act.") (emphasis added).

Moreover, even if the Executive Branch could declare new categories of criminal conduct (which it cannot), the 2016 Guidance would not provide the fair warning required by Due Process because the Guidance stated that the DOJ would only prosecute *naked* no-poach agreements. 2016 Guidance at 3-4. Indeed, in its press release announcing the publication of the 2016 Guidance, the FTC explicitly identified outsourcing arrangements within a category of exceptions to the government's general position on no-poach agreements. Feinstein, et al., Fed. Trade Comm'n, Office of Policy Planning, *supra* at 28.

In sum, government "policy" changes cannot change the constitutional rubric under which fair notice must be provided to the person of ordinary intelligence. Long-established judicial rulings are required for adequate notice that a category of conduct constitutes a *per se* violation of the Sherman Act. *See Leegin*, 551 U.S. at 886 ("[T]he *per se* rule is appropriate only after *courts* have had considerable experience with the type of restraint at issue, and only if *courts* can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason" (citations omitted) (emphasis added); *Topco Assocs. Inc.*, 405 U.S. at 607-08 ("It is only after considerable experience with certain business relationships that *courts* classify them as *per se* violations of the Sherman Act") (emphasis added). Here, there is no such precedent. As such, this prosecution, which charges a *per se* offense based on an alleged agreement not to hire or solicit in

the context of a collaborative business undertaking (a species of alleged conduct, notably, that is not present in any of the other recent no-poach, non-solicitation prosecutions), must be dismissed as a violation of Due Process.

## V.   Judicial Application of the *Per Se* Rule Violates the Fifth and Sixth Amendments' Prohibition of Conclusive Presumptions in Criminal Cases.

A criminal defendant may not be deprived of his liberty without a jury finding that each element of the offense with which he is charged has been proven beyond a reasonable doubt. Applying the *per se* rule to the Defendants' conduct here would violate this fundamental Fifth and Sixth Amendment guarantee.  In a line of decisions perhaps most prominently exemplified in *Apprendi v. New Jersey*, the Supreme Court has repeatedly made clear that a "judge's finding" can never be substituted for the jury's decision-making function, and thus "any fact" necessary for a defendant to be subject to a criminal penalty must be "submitted to a jury, and proven beyond a reasonable doubt."  530 U.S. 466, 476, 490-91 (2000); *see also, e.g.*, *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (invalidating imposition of death penalty based on judicial factfinding); *United States v. Gaudin*, 515 U.S. 506, 510 (1995) (Constitution "require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt").  Consistent with this bedrock principle, the Supreme Court has long held that conclusive presumptions that remove an element of a crime—that is, which "instruct[] the jury that it must infer the presumed fact if the [government] proves certain predicate facts," are unconstitutional in criminal cases.  *Francis v. Franklin*, 471 U.S. 307, 314 (1985).  A conclusive presumption impermissibly "removes the presumed element from the case,"

*id*. 314 n.2, and "directly foreclose[s] independent jury consideration of whether the facts proved established certain elements of the offenses." *Carella v. California*, 491 U.S. 263, 266 (1989).

Application of the *per se* rule in this case would risk applying such an impermissible conclusive presumption. It would mean, as argued by the government in other no-poach and non-solicitation cases, that the issues presented to jury might be limited to: (1) whether the charged conspiratorial agreement existed; and (2) whether the defendant under consideration intentionally joined the conspiracy. *See supra* at 40-42. If the government had its way, the jury thus would not be asked to consider whether the alleged market existed as alleged, whether defendants intended to unreasonably restrain trade and whether the charged agreement was in fact an unreasonable restraint of trade. Removing these factual determinations from the jury would deprive Defendants of their right to a trial by jury in which the jury considers and determines each essential element necessary to violate the Sherman Act.[27] *See* Robert Connolly, *How Per Se Rule Will Die In Criminal Antitrust Cases*, LAW 360 (Mar. 20, 2019); James J. Brosnahan & William J. Dowling III, *The Constitutionality of the Per Se Rule in Criminal Antitrust Prosecutions*, 16 SANTA CLARA L. REV. 55, 56 (1975); Charles D. Weller, *Price Fixing and Insider Trading are Unconstitutional Crimes*, LAW 360 (Feb. 6, 2015); Pet. for Writ of Cert., *Sanchez v. United States*, 140 S. Ct. 909 (2020) (No. 19-288), 2019 WL 4235513.

The Supreme Court has long acknowledged that the *per se* rule is "imperfect." *Maricopa Cty*, 457 U.S. at 344. The *per se* rule was judicially crafted to reduce "[t]he costs of judging business practices under the rule of reason," by allowing courts to "appl[y] a conclusive

---

[27] While there is Second Circuit authority accepting the constitutionality of the presumption associated with the *per se* rule in criminal cases, *see United States v. Koppers Co., Inc.*, 652 F.2d 290, 294-95 (2d Cir. 1981), for the reasons set forth herein, Defendants respectfully submit that the continued application of that authority cannot be squared with modern Supreme Court jurisprudence.

presumption that [a] restraint is unreasonable" once "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it." *Maricopa Cty.*, 457 U.S. at 343-44.[28]  As a result, the *per se* rule invalidates some conduct "that a fullblown inquiry might have proved to be reasonable" and thus not prohibited by the Sherman Act. *Maricopa Cty.*, 457 U.S. at 344.

Such an "imperfect" conclusive presumption has no place in criminal cases.  Judicial economy and efficiency, the principles justifying the *per se* rule in the civil context, cannot override the Constitution's fundamental guarantees of due process and a jury trial.  *See Blakely v. Washington*, 542 U.S. 296, 313 (2004) (adherence to constitutional rights "cannot turn on whether or to what degree trial by jury impairs . . . efficiency"); *Ring*, 536 U.S. at 607 (the right to a jury trial "has never been efficient") (quotation marks omitted).  In criminal antitrust conspiracy cases, the Constitution requires that the jury determine whether the defendant intentionally entered an agreement knowing that the agreement's illegal object was to unreasonably restrain trade.

## CONCLUSION

For all of the reasons set forth above, the Indictment should be dismissed.

---

[28] Whatever the merits of this approach at the time the Sherman Act was passed in the 1890s, or when the modern *per se* rule was first applied by the Supreme Court in *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940), the Sherman Act was only a misdemeanor statute when these events took place.  *See* Br. of Amicus Curiae Nat'l Ass'n of Criminal Def. Lawyers in Support of Pet'rs at 10, *Sanchez v. United States*, 140 S. Ct. 909 (2020) (No. 19-288), 2019 WL 5566391.  As applied in criminal cases today, the *per se* rule is out of step with contemporary Supreme Court law.  Should the Court allow this case to proceed, Defendants reserve the right to raise any and all arguments concerning the Constitutionality of the Sherman Act.

Respectfully submitted,

*/s/ Brian E. Spears*
BRIAN E. SPEARS (ct14240)
IVAN LADD-SMITH (ct30982)
LESLIE A. CAHILL (ct31242)
Spears Manning & Martini LLC
2425 Post Road, Suite 203
Southport, CT 06890
T: (203) 292-9766
F: (203) 292-9682
Email: bspears@spearsmanning.com

*Counsel for Mahesh Patel*

*/s/ Guy Petrillo*
GUY PETRILLO (pro hac vice)
CAELYN STEPHENS (pro hac vice)
Petrillo Klein & Boxer LLP
655 Third Avenue 22nd Floor
New York, NY 10017
T: (212) 370-0330
Email: gpetrillo@pkbllp.com

PAUL MCCONNELL (ct29062)
71 Elm Street, Suite 20
New Canaan, CT 066840
T: (203) 344-7007
F: (203) 344-7009
Email: paul.mcconnell@familylaw.com

*Counsel for Robert Harvey*

*/s/ Marc A. Weinstein*
MARC A. WEINSTEIN (pro hac vice)
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
T: (212) 837-6460
F: (212) 299-6460
Email: marc.weinstein@hugheshubbard.com

CRAIG A. RAABE (ct04116)
Izard, Kindall & Raabe LLP
29 South Main Street,
West Hartford, CT 06107
T: (860) 513-2939
F: (860) 493-6290
Email: craabe@ikrlaw.com

*Counsel for Harpreet Wasan*

*/s/ Richard F. Albert*
RICHARD F. ALBERT (pro hac vice)
PENINA MOISA (pro hac vice pending)
JORJA KNAUER (pro hac vice pending)
Morvillo, Abramowitz, Grand, Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
T: (212) 880-9560
F: (212) 856-9494
Email: ralbert@maglaw.com

PATRICK A. KLINGMAN (ct17813)
Klingman Law, LLC
280 Trumbull Street, 21st Floor
Hartford, CT 06013
T: (860) 256-6120
Email: pak@klingmanlaw.com

*Counsel for Steven Houghtaling*

*/s/ Marc Siegel*
MARC SIEGEL (pro hac vice)
Farmer Brownstein Jaeger Goldstein Klein & Siegel LLP
235 Montgomery Street, Suite 835
San Francisco, California 94104
T: 415-795-2050
F: 415-520-5678
Email: msiegel@fbjgk.com

JAMES M. MORIARTY (ct21876)
Zeisler & Zeisler, P.C.
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604
T: (203) 368-4234
F: (203) 368-5485
Email: jmoriarty@zeislaw.com

ANTHONY CHARLES LAKE (pro hac vice)
CRAIG A. GILLEN (pro hac vice)
Gillen Withers & Lake LLC
400 Galleria Parkway
Suite 1920
Atlanta, GA 30339
T: (404) 842-9700
F: (404) 842-9750
Email: aclake@gwllawfirm.com

*Counsel for Tom Edwards*

 */s/ Audrey A. Felsen*
AUDREY A. FELSEN (ct20891)
Koffsky & Felsen, LLC
1150 Bedford Street
Stamford, CT 06905
T: (203) 327-1500
F: (203) 327-7660
Email: afelsen@aol.com

*Counsel for Gary Prus*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 29, 2022, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may access this filing through the Court's CM/ECF system.

*/s/ Guy Petrillo*
Guy Petrillo